**PANAS v. TEXAS BREEDERS & RACING ASS'N, Inc., et al.**

No. 10263.

Court of Civil Appeals of Texas. Galveston. March 1, 1935.

Rehearing Denied March 21, 1935.

C. R. Goslin and C. F. Stevens, both of Houston, for appellant.

Hirsch, Susman & Westheimer and Harry Susman, all of Houston, for appellees.

PLEASANTS, Chief Justice.

This appeal is from a judgment of the trial court refusing the appellant a temporary injunction in a suit for that relief brought by him against the appellees.

Plaintiff's petition alleges in substance that defendants, the corporation above named, and E. J. Hussion, the president of the corporation, and Lou Smith, have their respective domicile and place of residence in Harris county; "that heretofore, to-wit, on and prior to the 22nd day of November, A. D. 1934, that said defendants and each of them above mentioned were using, and are now using, concerned in using, and are actually and habitually using, and are threatening and contemplating the use of premises, places, buildings, and parts thereof, situated on described tract of land in Harris County, Texas" (here follows a full description of the premises, the race track, and buildings owned and operated by the defendant corporation and known as Epsom Downs); that "the said defendants, and each of them, are so using, and are aiding and abetting some other person and each other in the use of the above mentioned and described premises, places, and buildings, and a part thereof, for the purposes of gaming and of keeping and exhibiting of games prohibited by the laws of the State of Texas."

The prayer of the petition was for a temporary injunction, and that upon a final hearing the injunction be made perpetual.

To this petition appellees presented a general denial, several special exceptions, and further answering under oath denied generally all of the allegations of the plaintiff's petition, and specially pleaded that the temporary or permanent injunction prayed for by plaintiff "should be in all things denied for the reason that the pleading of the plaintiff is not direct, particular, or concise, and that all intendments and presumptions should be indulged in by this honorable Court against the exercise by this Court of its most gracious writ of restraining order, temporary injunction and permanent injunction. That this honorable Court should not issue a restraining order, temporary injunction or permanent injunction upon pleading based entirely on the legal conclusion that a

game is prohibited by the laws of the State of Texas; that there are many games not prohibited and many games expressly permitted by the laws of the State of Texas, and, therefore, plaintiff's prayer should be in all things denied."

Upon the hearing in the court below upon the application for temporary injunction, the trial court overruled defendants' general demurrer and special exceptions. After hearing the evidence offered by plaintiff and the arguments of counsel thereon, the court granted a motion by defendants that the temporary injunction be denied. This motion was made with the reservation by the defendants of the right to introduce testimony in event the motion should be overruled.

The only evidence presented to the court by plaintiff was the following affidavit of B. D. Kessinger, a witness for plaintiff:

"I. That B. P. Panas, the plaintiff in the above numbered cause, is a resident and citizen of Harris County, State of Texas, and that the Texas Breeders and Racing Association, Inc., is a corporation, duly incorporated under the laws of the State of Texas, and that E. J. Hussion is president and Lou Smith is the general manager of said corporation.

"II. That said defendants corporation is a racing association, operating a horse race course known as Epsom Downs, situated in the County of Harris, State of Texas, and operating said race course upon a tract of land described in paragraph number two (#2) of plaintiff's original petition.

"III. That the said defendants have received from the Racing Commission of Texas, a permit authorizing it to race horses upon the premises described under article 655a of the Penal Code of the State of Texas [Vernon's], known as a certificate system, and that said defendants have received a license from said Racing Commission authorizing it to race horses upon said premises above set forth, under the terms and conditions set forth, under said article 655a of the Penal Code of the State of Texas.

"IV. That under said certificate and license system the said defendants have been and are now authorized at this time and are authorized in the future to collect and receive contributions of money from any person present at such race toward the entry of any horse in a horse race selected by such person to run first in such race, and the person so contributing such money shall acquire an interest in the total money so contributed on all horses in such race as first winners in proportion to the amount of money contributed by such persons.

"V. And also to receive the said contributions of money and issue to the contributors thereof certificates on which shall be shown the number of the race, the amount contributed and the number or name of the horse, respectively, selected by such person as first winner.

"VI. And also said license further authorizes the defendants to deduct from the total sums contributed on all horses as first winners, respectively, ten per cent (10%) of the amount thus contributed, and the odds of the redistributions over the next lowest multiple of five (5) and the balance remaining on hand shall be paid out to the holders of certificates on the winning horse, respectively, equally in proportion as the amount contributed toward the entry of all horses in said race to run first. Sub-Sec. 2. The licensee, in like way, may receive such contributions on horses selected to run second, third, or both, the method of procedure and the right of the licensee to be specified in the next preceding section hereof.

"VII. That in conformity with such license and under said certificate system the defendants are now daily, with the exception of Sunday, conducting horse racing upon said premises, and maintain buildings thereon for the purpose of carrying out, conducting, controlling and paying the moneys won by the various winners of the bets on said horse races and that the said race course now in operation by the defendants will continue until the 15th day of December, 1934, and at such other times as defendants in the future may conduct additional races, under said certificate system; that under said certificate system betting is being done and will be done by persons attending said race meets of defendants, who contribute moneys upon said races which bets are made in the following manner:

"VIII. That the horses which are to be raced are each numbered, with the names of the jockeys who are to ride the same, which is designated upon a board and tickets are sold to contributors or bettors by clerks within certain windows, said windows within said buildings, said buildings upon said premises, as above described, who operate on behalf of the defendants. At the time the bets are being made the contributor does not know the amount which he may win upon a given race; such amount depending upon the amount of money bet as he does, upon the same horse or against the same horse.

In other words, if the contributor or bettor who bets $2.00 upon a horse to run first or straight; second or place; third which is called show; wins upon his bet on the ticket given him, the amount which is to be received upon his bet will depend upon the full amount bet upon any given horse for either the place which is designated on the ticket, his winnings will depend upon whether a large amount or a small amount has been bet upon the same number as he has bet. In other words, if he has bet that horse number one will come in straight or first, if $1,000.00 is bet in the same race, (as) this bettor or contributor has bet, and $10,000.00 has been bet the other way, he will win less than he would win. if $100,000.00 has been bet the other way, instead of $10,000.00. * * * "

As illustrating this method of betting, this affiant further says:

"Bets are taken at a series of 'betting' or 'take' windows, which are located both on the ground beneath the stands and on the second level, within the upper stands. These 'take' windows are divided into two groups: $2 windows and $5 windows. In other words, there are windows at which bettor may bet $2 (buying as many $2 tickets as he desires) or $5 (for making larger bets). These windows are operated exactly the same, so we will take the $2 window as an example, since all quotations of odds are made on the basis of a $2 bet.

"The $2 windows are divided into three groups: 'Straight'; 'Place'; and 'Show.' These terms are defined as follows: A straight bet is a bet that a horse will win the race; a place bet is a bet that he will run second or better, and a show bet is a bet that the horse will run third or better. Obviously, straight bets pay larger prices, show bets smallest of all.

"Odds quoted are always approximate, and are quoted on 'straight' betting. Bettor never knows the approximate odds of place and show betting, except as he can guess from the straight odds given.

"In betting, bettor goes to straight, place, or show window, according to manner in which he wishes to bet. Paying $2, he is given a ticket, which carries a number. This number corresponds with the number given the horse in the program sold at the track (not with his post position or racing number). It does not carry the horse's name, but does show in large letters the number, the amount bet and the manner (whether straight, place or show).

"Approximate odds, based on the amounts of money bet on the various numbers in the race, are shown on a large 'odds board' located in front of the grand-stand on the far side of the track stretch. Here, horses' numbers, weights, and racing numbers are shown in large white letters, with the approximate odds opposite. As these odds change with the betting, depending upon the amount of money bet on each horse in the race, space is provided for first approximate odds, second approximate odds, and final approximate odds. After the running of the last previous race, the numbers of the horses for the next race are posted, with the first approximate odds, based on bets made earlier. These odds are changed about 15 minutes before the running of the race, after more bets have been made, and again about five minutes before the running, when 'final odds' are posted. It must be understood that these odds are approximate only, based on bets made up until time change is made, and that the track does not attempt to state actual odds that will be paid. As much figure work is necessary to reach odds, the clerks cannot be accurate to the minute, and odds often change drastically after being posted, due to heavy betting on certain horses.

"Thus, heavy betting on one number can change the odds of. that number and all others.

"This can best be understood after an explanation of the manner of figuring odds, and of paying bets.

"After a race has been run, betting clerks total all money bet on all numbers in that race; the total amount bet at the straight windows goes to those bettors holding win tickets on the horse that ran first, after deduction of 10 per cent. As an example:

"Straight Jacket wins. 1,000 tickets have been purchased on all horses, making a total bet of $2,000 at the straight or win windows. 40 of those tickets ($80) have been bet on Straight Jacket, so there are 40 winners. First, 10 per cent. is deducted from the total bet, leaving $1,800 in the betting pool. This amount is divided equally among the winners, giving each winner $45 for his $2 ticket. Thus, having bet $2, each winner receives $45 by presenting his ticket at the 'cashier' window, and has a profit of $43."

The affidavit further shows that the results of betting on horses for place and show are determined upon practically the same general basis of computation as that above shown for bets on a horse for first place. This affiant further says:

"That approximately a hundred thousand dollars ($100,000.00) is bet each day on said races; and approximately one hundred (100) agents of the defendants sell the tickets above set forth.

"That said defendants are conducting said races and will continue same in accordance with 655a of the Penal Code of the State of Texas, under license certificate system of said racing commission."

Appellant, in the brief filed by his counsel, assails the judgment refusing him a temporary injunction on the following grounds: That the undisputed evidence shows that the defendants were engaged in a gaming transaction; that the certificate system under which defendants are operating their races is a species of gaming known as a lottery, and the act of the Legislature authorizing such system of betting on horse races is unconstitutional and void; that the act authorizing betting upon horse races under the certificate system under which defendants are operating their race track does not specifically nor by necessary implication repeal the provision of article 648 of our Penal Code (Vernon's Ann. P. C.), which penalizes betting upon horse races; and that "the uncontradicted proof in the case having shown that the defendants were actually and habitually using, threatening to and contemplating the use of the premises described in plaintiff's petition, and aiding and abetting other persons and each other in making use of the premises described in plaintiff's petition for the purpose of gaming and keeping and exhibiting games prohibited by the Laws of Texas, the court erred in not granting a temporary injunction as prayed for by the plaintiff."

■ Appellees first answer all of appellant's objections to the judgment by presenting the proposition, or point, that appellant, a private citizen who does not allege or show an invasion or threatened invasion of any property or civil right by the operation by appellees of the race track at Epsom Downs, cannot maintain this suit, because in the operation of such race track under and in compliance with article 655a of the Penal Code of the state, they are not violating the gaming laws of the state, and the trial court should therefore have sustained appellees' general demurrer to appellant's petition.

The only statute under which appellant claims the right to bring this suit is article 4667 of our Revised Statutes, which authorizes any citizen of the state to institute suit to enjoin "the habitual use, actual, threatened or contemplated, of any premises, place or building or part thereof, * * * for gaming or keeping or exhibiting games prohibited by law."

An examination of all of the gaming statutes of this state fails to show that the Legislature, in the enactment of the several statutes prohibiting betting on horse races, considered such betting as gaming or keeping or exhibiting games. The games prohibited by law are specifically described in the various statutes by which they are prohibited and penalized. Horse racing is not mentioned in any of these statutes. The first act of the Legislature providing a penalty affecting horse racing was a bill prohibiting such races across public squares. This bill was enacted in 1873. 7 Gammell's Laws of Texas, 535. In 1903, when the Legislature came to pass the act (Acts 1903, c. 50) which prohibited the taking or accepting of a bet on a horse race, the act was not passed as an addition to general gaming statutes, but as a separate law. When the statute was enacted giving a private citizen the right to bring a suit to enjoin the keeping or exhibiting of games prohibited by law, the Legislature knew of the general gaming statute and also of the statute prohibiting betting on horse racing or conducting a pool for betting on horse racing, but did not include such offense among those for the prevention of which the private citizen was given the right to sue for an injunction. Section 4 of the Act of 1905 (Acts 1905, c. 153), giving the private citizen the right to bring suit to enjoin violations of our gaming statute, declares as a reason for its passage that 'there was no adequate remedy for the suppression of gaming houses.

In 1925, when the statutes of the state of Texas were revised, the 1905 law permitting a private citizen to sue for an injunction against the conducting of gaming houses became R. S. art. 4667. The revision of this act was undertaken, having in view not only the general gaming statute, but also the lottery statute, the horse betting and pool making statute, the bookmaking statute, and many other separate and distinct antibetting statutes of the Penal Code. R. S. art. 4667 enlarges the provision of the act of 1905 and provides for a private citizen securing an injunction to enjoin (1) for gaming or keeping or exhibiting games prohibited by law; (2) for keeping or being interested in a bawdy or disorderly house; and (3) for carrying on bucket shops.

If betting upon horse races which has been, as before shown, prohibited and penalized by our statute for a number of years could ever have been held a game in the purview of this

statute above quoted, it seems clear to us it cannot be so held since the enactment by our Legislature of the statute (now article 655a of our Penal Code, as shown in Vernon's Annotated Penal Code of this state), which legalizes betting upon horse races conducted under the certificate plan or system provided in the statute, and declares: "The said certificate system as herein authorized shall not be construed to be either pool selling, betting or bookmaking within the meaning of Articles 645, 647 and 648 of the Penal Code of the State of Texas, Title 2, Chapter 6, according to the 1925 revision."

We do not think the certificate system of betting on horse races can be called a lottery, as that term is used in section 47, article 3, of our Constitution, which prohibits "the establishment of lotteries * * * or other evasions involving the lottery principle, established or existing in other States." The Legislature in enacting the certificate system of conducting horse racing did not consider such legislation a violation of our constitutional prohibition against conducting lotteries. The construction placed by the Legislature upon the constitutional prohibition against conducting a lottery in this state will not be set aside by the courts unless in their opinion such construction is clearly wrong, and we cannot so hold in this case. State ex rel. Guerguin v. McAlister, 88 Tex. 284, 287, 31 S. W. 187, 28 L. R. A. 523; Whitener v. Belknap, 89 Tex. 273, 34 S. W. 594.

If this system of betting could be called a lottery, such betting is not a violation of our gaming statutes as that term is used in article 4667 under which appellant claims the right to bring and maintain this suit.

The conclusions above expressed require that the judgment of the trial court refusing the temporary injunction should be affirmed, and it has been so ordered.

Affirmed.