# CITY OF WINK V. GRIFFITH AMUSEMENT COMPANY.

No. 6899.   Decided December 30, 1936.
Rehearing overruled March 3, 1937.
(100 S. W., 2d Series, 695.)

*A. T. Folsom,* of Wink, for plaintiff in error.

The petition of plaintiff amusement company shows that it seeks an injunction to prevent the City of Wink from abating an illegal enterprise, wherefore it was in no event entitled to equitable relief. Wade v. Nunnelly, 46 S. W. 668; Malott v. City of Brownsville, 298 S. W. 540.

If the ordinance in question be partially invalid, such fact will not invalidate those portions not in conflict with the State law, and the city is entitled to enforce such valid portions, and as to such the injunction should be dissolved. El Paso Electric Co. v. Collins, 23 S. W. (2d) 295; Texas & Pac. Ry. Co. v. Mahaffey, 98 Texas 392, 84 S. W. 646.

*H. Eugene Wassell*, of Wink, for defendant in error.

It was not error to hold that the ordinance in question was void. Spann v. City of Dallas, 111 Texas 350, 212 S. W. 513; Crossman v. City of Galveston, 247 S. W. 813; City of Amarillo v. Garwood, 63 S. W. (2d) 888.

It was error for the Court of Civil Appeals to hold that "bank night" as conducted by plaintiff was against public policy. Gulf Refining Co. v. City of Dallas, 10 S. W. (2d) 151; City of Austin v. Cemetery Assn., 87 Texas 330, 28 S. W. 528; West v. Carlisle, 111 Texas 529, 241 S. W. 471.

MR. CHIEF JUSTICE CURETON delivered the opinion of the Court.

The full statement of the case in the opinion of the Court of Civil Appeals (78 S. W. (2d) 1065) will suffice for the purposes of this opinion.

The Griffith Amusement Company, a corporation, was engaged in operating a moving picture theatre in the City of Wink, in Winkler County. One day in each week it conducted what it designated as "Bank Night." What the "Bank Night" feature was and how it was operated, and the result thereof, is stated in defendant in error's petition in the following language:

"Plaintiff alleges that for several months prior to the passage of the ordinance complained of, the plaintiff as a part of its weekly business, advertised and conducted what is termed its bank night; that on a certain night of each week it will give thirty-five dollars to any person present who has registered at the theatre; a number is drawn by Judges selected from the audience; that it is not necessary for the person who wins the prize to be actually in attendance in the theatre, it is not necessary for him to have ever been in attendance in the theatre or to have ever purchased a ticket, provided he registered his name in the book that was left open at the ticket window for the public to register their names; that there was no charge whatever made as a condition of registration, that this idea of holding bank night is a copyrighted idea that the plaintiff pays for; that it is in operation throughout the entire country, and is a special means of advertising; that by virtue thereof the ticket sales at plaintiff's theatre on the nights that it holds bank nights are greatly increased, and will amount to approximately $100.00 to $200.00 per week more than its revenue would amount to when not being permitted to operate its bank night; such plan induces increased attendance and acquaints the public with the high class pictures presented at such theatre; that without

being able to hold bank nights the patrons will fail to attend the theatre, and that the loss by reason of the failing of the attendance will amount to at least $100.00 per week or more for every week in the future."

The operation of the "bank night" prize drawing proved a very valuable source of income to the theatre, the relative weekly returns from the "bank night" operations being on the average $178.98 more than were received prior to the institution of the plan. The giving of right by a registration number to the drawings *"free"* or without the customer buying a theatre ticket was not *"pushed"* or featured to any very great extent. In fact, the witness DeIrio, the manager of defendant in error, testified that the fact that the public could obtain registrations *free* entitling them to a "chance" at the prize to be drawn was not generally known to the public—that he *did not try to make it "too public, that it was never advertised."*

The actual money returns on "bank night" would suggest that if any free numbers were ever distributed, they were negligible. We gather from the whole testimony that the so-called "free number" feature was largely one that existed in the minds of those who operated the theatre, and that it was never made a real active part of the "bank night" plan. True, no doubt if any one had applied for a free registration to the drawing, it would have been given, but human nature is such that the average person would seldom, if at all, suffer the natural embarrassment of asking for a *free* registration. Indeed, if this were not so, the income from "bank nights" would not have been substantially more than that which had obtained prior to the operation of the plan. In fact, the whole plan is built up and made profitable because no normal person likes to "bum" his neighbor for something, and by an appeal to the psychology of cupidity which makes some take a chance of making large gains by a small outlay. Those who invented and formulated the plan may not have been "learned in the law," but their knowledge of mass-psychology was not wanting.

The action was brought by the Griffith Amusement Company to restrain the City of Wink and certain of its officers from enforcing the provisions of a city ordinance, which is copied in full in the opinion of the Court of Civil Appeals. The first section of the ordinance reads as follows:

"Sec. 1. That it shall be unlawful for any person, firm or corporation, either as owner, manager, operator, agent or employee, to have, give, permit, or allow any prize drawing, by lot, of any money or other thing of value, at any place of public amusement or entertainment in the City of Wink."

Section 3 of the ordinance, prescribing a penalty for its violation, reads:

"Sec. 3. Any person violating this ordinance shall be guilty of misdemeanor and upon conviction shall be fined not exceeding ($100.00) One Hundred Dollars, and each day of violation shall be a separate offense."

The City of Wink and its officers answered in the usual way, and by cross action asked that the defendant in error be enjoined from conducting the "bank night" drawings at its theatre in the city, as had been its custom. The trial court granted a temporary injunction, restraining the City and its officers from enforcing the ordinance involved, as prayed for by the defendant in error, and denied the application for temporary injunction asked by the City in its cross action. Upon appeal, the judgments of the trial court were affirmed by the Court of Civil Appeals. The application for writ of error granted by us was on behalf of the City and its officers.

1 We agree with the Court of Civil Appeals that the ordinance involved is void, for reasons well stated by that court. The inhibitory provisions of Section 1, quoted above, are broad enough to include lotteries. It may be that they also include "gift enterprises" not within the provisions of the State Lottery Statute, but the descriptive language used contains no exceptions, and by Section 3 one penalty is provided for the offense, or offenses, defined by Section 1. The State Penal Code does not define a lottery, but our courts have interpreted it, in accordance with public usage, to mean a scheme or plan which provides for a distribution of prizes by chance among those who have paid, or agreed to pay, a consideration for the right to participate therein. 28 Texas Jurisprudence, page 409, Section 2, and cases cited in the notes.

2 Article 654 of the Penal Code provides as a penalty for establishing a lottery a fine of "not less than one hundred nor more than one thousand dollars." The penalty prescribed by the ordinance in question, as shown above, is a fine "not exceeding ($100.00) One Hundred Dollars, and each day of violation shall be a separate offense." It will at once be observed that the penal provisions of the ordinance are different from those contained in the State Penal Code, although both acts cover the offense of conducting a lottery. The rule is definitely established with us that the penal provisions of an ordinance can not be different from those of the Penal Code for the same offense, and that ordinances in conflict with the general or State law are void. 30 Texas Jurisprudence, page 301, Section 167, page

304, Section 168, and cases cited in the notes; El Paso Electric Co. v. Collins, (Com. App.) 23 S. W. (2d) 295, 296.

The Court of Civil Appeals, however, although holding that defendant in error's "bank night" plan was a lottery, and its operation a violation of the law, and that "it is not entitled to the injunctive relief prayed for," nevertheless affirmed the judgment of the trial court, saying:

"However, appellee, we think, can properly complain that the City of Wink is prosecuting and undertaking to enforce a void penal section of its ordinance."

3  The Court of Civil Appeals also affirmed the judgment of the trial court *refusing* to grant a temporary injunction in favor of the City of Wink. This was manifestly correct, because, since Sections 1 and 3 of the ordinance were void for the reasons stated above, the whole ordinance was void, all sections being interdependent and related to these sections. In so far as it might be said that the City had the right to enjoin the defendant in error from conducting a lottery in violation of the State law, the answer is that the statute has made no provision for the powers of a court of equity to be invoked by a municipality to prevent the violation of the lottery laws of the State as such.

In so far as it may be said that the City had the right to enjoin the defendant in error, and abate the nuisance created, if any, by its "bank night" operations, in causing crowds to gather on the streets and sidewalks, etc., in such manner as to obstruct the use thereof, and to create fire hazards, the pleading and the evidence show that the defendant in error was no longer announcing its drawings in such a manner and at such a time and place as would cause such gathering of people or the creation of such a public nuisance.

4  The Court of Civil Appeals held, as stated, that the "bank night" plan of defendant in error constituted a lottery. This may be correct. There are authorities which support this conclusion (Featherston v. Independent Service Sta. Assn., 10 S. W. (2d) 124), and upon reason the conclusion appears sound. In the instant case there were two different classes of possible prize winners,—namely, the holders of free registration numbers, who chose to remain outside of the theatre, where neither the show nor the paraphernalia of and actual operation of the drawing could be seen, and those who, at least on "bank night," paid the consideration required at the door, entered the theatre, and saw the show, including the paraphernalia to be used in the drawing, and the actual drawing itself while comfortably seated close at hand so that they might hear without fail the

announcement of the winner and be present to claim the prize, each privilege a concomitant part of the entire scheme. It is idle to say, as to those who entered the theatre and enjoyed the privileges named, that the admission charge was not both for the show and the pleasure and advantages stated above and the prize emolument of the ·drawing. This admission charge is inseparable from the privileges enumerated, which were materially different from the privileges of those who remained outside of the theatre holding the so-called "free" registration numbers. It is idle to say that the payment made for seeing the picture is not, in part at least, a charge for the drawing and the chance given. The things to be seen and done in the theatre, and the privileges above enumerated which accompanied them, are all a part of *one and the same show,*—meaning the entire proceedings inside the theatre. The fact that part of the things to be enjoyed by those who paid at the door were classed as "free" by the defendant in. error does not change the legal effect of the transaction, or what was actually done by defendant in error,—namely, for the price of admission to grant the patron not only the opportunity to see and hear the picture, but to see and hear and enjoy the habiliments of the "bank night," drawing, etc., detailed above. We are unable to see in what manner the giving of free registration numbers to those outside of the theatre would change the legal effect of what was done inside the theatre, for which a charge was made; nor does the fact that a claimant's right to the prize was evidenced by a registration book instead of a ticket, as is usual in lotteries, change the legal result. The registration numbers represented *"chances"* at the prize just as effectively as would tickets to the drawing.

The case of Taylor v. Smetten, decided by the Queen's Bench Division of the English Courts (11 L. R. S. C. J., p. 207), very well supports the conclusion stated above, to the effect that the charge made at the theatre door was for both the theatrical performance and the prize drawing. The court in that case said in part:

"Although it was admitted by the respondent that the tea was good and worth all the money, *it is impossible to suppose that the aggregate prices charged and obtained for the packages did not include the aggregate prices of the tea and the prizes. Nor can it be doubted that in buying a package, the purchaser treated and considered it as a purchase of the tea and the coupon, whatever its value might turn out to be. In other words he bought the tea coupled with the chance of getting something of value by way of a prize."*

The doctrine of this case, to the effect that a chance at a prize given "free" with a purchase is not in fact "free," but that payment for it is embraced in a part of the purchase price, is supported by our own courts. American Copying Co. v. Smith, 110 S. W. 777; Featherston v. Independent Service Station Association, 10 S. W. (2d) 124, 127.

**5** We think it plain from the above discussion that the Court of Civil Appeals had substantial grounds for the conclusion to the effect that the "bank night" plan of defendant in error was a lottery. However, whether or not a lottery within the meaning of the Penal Code, it is quite plain to us that defendant in error could not maintain an equitable action to restrain the enforcement of the invalid ordinances here involved, for reasons which will now be stated.

Section 47 of Article 3 of the Constitution of this State reads:

"The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises, or other evasions involving the lottery principle, established or existing in other States."

An analysis of this provision shows that the framers of the Constitution condemned in emphatic terms the establishment and operation in this state of (a) *"lotteries,"* (b) *"gift enterprises,"* and (c) *"other evasions involving the lottery principle."* Lotteries *only* have been prohibited by the Penal Code in accordance with the constitutional mandate. "Gift enterprises" and "other evasions involving the lottery principle" nevertheless remain and stand condemned by the Constitution of the State as being against public policy. It is hardly necessary to. argue that the "bank night" plan of the defendant in error, if not a lottery, is at the very least a "gift enterprise involving the lottery principle," and obviously an evasion of the lottery laws of the State. That "gift enterprises" are a form of lottery evasion is so well known that courts take judicial knowledge of the plan. 38 C. J., p. 296, Sec. 14; State v. Bader, 24 Ohio N. P. (N. S.) 186. Moreover, "gift enterprises" were well known in this State when the Constitution of the State was formulated in 1875 and adopted in 1876. State v. Randle, 41 Texas 292; Randle v. State, 42 Texas 580. In the argument in favor of the appellant in Randle v. State, 42 Texas 580, supra, distinguished counsel for the appellant in that case argued that "gift enterprises" were so well known "as almost to be judicially proven."

**6**  These cases were decided in 1875, the very year the Constitution was formulated. Moreover, the statutes of this State enacted in June, 1873, provided for licensing "gift enterprises." Paschal's Digest of the Laws of Texas, Sec. 7708. This licensing statute defined "gift enterprises" as follows:

"For every *gift enterprise* $500.00. Every person, firm or corporation who shall sell anything with a promise, either expressed or implied, and give anything in consideration of such sale and purchase, shall be regarded as the proprietor of a *gift enterprise.*" (Italics ours.)

Obviously it was not the purpose of this statute to require a license before one could actually make bona fide gifts of his property in connection with sales without any purpose to destroy or limit the equal rights of others, because such a purpose would have made the statute void as being in violation of the Constitution. The right of property is the right to use and enjoy, or dispose of the same, in a lawful manner and for a lawful purpose. Cooley's Const. Lim. (8th ed.), Vol. 1, p. 740, Note 1; 9 Tex. Jur., p. 570, Sec. 128.

Nor can it be said that the purpose of the enactment was to license the operation of lotteries, for that was prohibited by the Constitution as well as by statute. So we must conclude that the purpose of the provision was not to require a license for one to make ordinary gifts of his property, but its purpose was to provide some regulation for the conduct of a business so near the dividing line of the exercise of the right of property and the operation of a lottery as to protect the public from lottery schemes, such for example as lacked some essential element of a lottery and yet into which the lottery element of chance entered, which was a constitutional purpose. The ease with which the lottery laws could be violated, and which no doubt were being generally violated, made it necessary to license such concerns as "gift enterprises," upon the same principle that laws for the inspection of certain classes of property are sustained under the organic law, or by which other classes of business and occupations may be constitutionally regulated.

It may be said, in passing, that in the two cases cited above the Court held that the plan of the Galveston Gift Enterprise Association was a lottery.

The Constitution of 1845 merely prohibited lotteries and the buying and selling of lottery tickets. Section 17, Article 7, Constitution; Gammel's Laws, Vol. 2, p. 1293. Section 36, Article 12, of the Constitution of 1868 contained the same provision. In accordance with this provision, or a similar provision in preceding Constitutions, the Legislature, as shown above,

enacted a criminal statute prohibiting lotteries and the sale of lottery tickets. Paschal's Digest, Sec. 2039. Following this there arose the era of evasions, which undoubtedly were general, because the Legislature in 1873, as we have seen, undertook to license these so-called "gift enterprises." So it is plain that when the Constitution was formed the Convention which formulated it had before them an abuse which they sought to correct,—namely, the operation of "gift enterprises involving the lottery principle," such as were currently known or came within the licensing statute quoted above. It will be noted that the licensing of "gift enterprises" by the statute did not necessarily authorize the operation of a lottery, but something else,—namely, "gift enterprises" as defined by the statute. Accordingly, the framers of the present Constitution changed the wording of previous constitutional provisions and condemned such "gift enterprises," such as came within the definition previously quoted, by declaring that not only lotteries, but "gift enterprises and other evasions involving the lottery principle" as contrary to the public policy of the State, and made it the duty of the Legislature by penal laws to prohibit their operation. Unless something short of an actual lottery was intended to be prohibited, it would have been quite unnecessary to change the terms of previously existing constitutional provisions. We must, therefore, give effect to the language employed in the Constitution of 1876, in substance that "gift enterprises and other evasions involving the lottery principle" should also be condemned and prohibited. 9 Tex. Jur., p. 438, Sec. 26, p. 429, Sec. 21; Cooley's Const. Lim. (8th ed.), Vol. 1, p. 141. Giving it effect, we must say that "gift enterprises" previously authorized by the statute were considered as evasions involving the lottery principle, and they, as well as all other evasions involving this principle, were condemned. In fact, this Court prior to the adoption of the Constitution had judicially determined that enterprises such as that before us were devices and subterfuges for evading the lottery laws. In the Randle case, supra (41 Texas 292), we said that *"gift enterprises,"* "gift sales," "American Art Union," "prize concerts," and "gifts for the million," etc., were *"devices and subterfuges which are used by those who seek to evade the law or entice to their own profit the credulous and unwary."*

If it be granted that the plan of defendant in error's "bank night" was not a lottery because a charge was not made for the registration entitling one to participate in the drawing (and this is the only distinction which is here or could be made), then it clearly comes within the condemnatory terms of the

Constitution, because it is a "gift enterprise" involving the lottery principle, which the authorities hold is that principle by which something is to be given by chance. 38 C. J., pp. 286 and 287, Sec. 1 and authorities in Note 8, and p. 289, Sec. 3.

In general, it may be said that chance is the basic element of a lottery. Unless a scheme for the awarding of a prize requires that it be awarded by a chance, it is not a lottery. As said in the case of State v. Lipkin, 169 N. C. 265, 84 S. E. 340, L. R. A. 1915F, p. 1018, Ann. Cas. 1917D, 137:

"The ingredient of chance is, obviously, the evil principle which the law denounces and will eradicate, however it may be clothed, or however it may conceal itself in a fair exterior."

There are, however, in a lottery, according to the authorities, three necessary elements,—namely, the offering of a prize, the award of the prize by chance, and the giving of a consideration for an opportunity to win the prize. 38 C. J., p. 289, Sec. 2. But the Constitution condemns those things which fall short of containing all the essential elements of a lottery,—namely, those things which involve the lottery principle, of which "chance" is the one which constitutes the very basis of a lottery, and without which it would not be a lottery.

An "evasion" is defined by Webster's International Dictionary as "act of eluding or avoiding," or "avoidance by artifice."

7 Defendant in error's "bank night" plan was obviously an evasion of the lottery laws by the avoidance of a direct charge for prize chances (all other elements of a lottery being present), but, nevertheless, having the object of enriching the defendant in error by the "chance" of gain just as much as though a direct charge had been made therefor,—manifestly an attempted "avoidance" of the lottery statute "by artifice" in accordance with the generally accepted definition of "evasion." Therefore, defendant in error's "bank night" plan stands condemned by the Constitution of Texas. Being condemned by the Constitution, it is against the "public policy of the State." 10 Tex. Jur., pp. 191, 192, Sec. 110, and authorities *post*. Being against the "public policy of the State," as thus manifested and fixed by the supreme law of the State—the Constitution—which governs all persons in all their activities, for no act can be in the exercise of a right which violates the public policy of the State, it follows that in this case the defendant in error in seeking to enjoin the void ordinances in question had no *right* to be protected.

This is fundamental,—to-wit, that one must come into court not only with a *legal right* to be *protected, but also with "clean hands" as well.* One whose business violates the public policy of the State (in this instance fixed by the Constitution), having

no legal right to be protected, and not coming into court with "clean hands," because his activities violate the public policy of the State, can not be given relief in a court of equity. 21 C. J., p. 40, Sec. 14, p. 180, Sec. 163, pp. 192, 193, Sec. 178; 9 Tex. Jur., pp. 110, 111, sec. 10.

**8, 9** Since the defendant has no *right* to be protected in the operation of its "bank night" plan, and since that plan violates the public policy of the State as declared in the Constitution, it does not come into court "with clean hands," speaking in the phraseology of courts of equity. It follows that defendant in error can not maintain its suit, and its action should have been dismissed. Nor is the plaintiff in error in any better position. It can not maintain its cross action or suit for injunction for two reasons: First, because the ordinance which it seeks to enforce by injunctive relief was void, as we have seen; and, second, because the right to enjoin a corporation for violating the public policy of the State as an abuse of its corporate franchise has not been confided to plaintiff in error, but to the Attorney General. Constitution, Article 4, Section 22.

Since neither plaintiff in error nor defendant in error could maintain their respective actions, it follows that the trial court should neither have heard the cause made by the original petition of defendant in error nor the cross action pleaded by the plaintiff in error.

The judgments of the trial court and Court of Civil Appeals are both accordingly reversed, and this suit, including that of plaintiff as set forth in its petition, and the cross action as pleaded by the defendant, is dismissed.

Opinion delivered December 30, 1936.

Rehearing overruled March 3, 1937.