**Office of the Attorney General**
**State of Texas**



**DAN MORALES**
ATTORNEY GENERAL

August 23, 1994

Honorable John T. Montford
Chair
Finance Committee
Texas State Senate
P.O. Box 12068
Austin, Texas 78711

Honorable Senfronia Thompson
Chair
Committee on Judicial Affairs
Texas House of Representatives
P. O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-302

Re: Whether the legislature may, by statute, and in the absence of a constitutional amendment, authorize the operation of slot machines within the state of Texas; or, in the alternative, whether it may authorize the state to operate slot machines and to contract with one or more entities that will operate the slot machines on behalf of the state (RQ-642, ID# 23991)

Dear Senator Montford and Representative Thompson:

Senator Montford requests our opinion as to whether the legislature may, by statute and in the absence of a constitutional amendment, authorize the operation of slot machines within the state of Texas. If the answer to this question is "no," Representative Thompson asks whether, under the 1991 amendment to the Texas Constitution, the legislature may authorize the *state* "to operate slot machines and to contract with one or more entities that will operate the slot machines on behalf of the State." We do not here determine whether any particular device which might be labeled a "slot machine" actually conforms to the statutory definition of "gambling device." Rather, for purposes of this opinion, we accept Senator Montford's description of a "slot machine" as

> a machine that runs electronically or mechanically and contains slots
> into which the player deposits money in the form of currency, coins,
> tokens, or a magnetic card, on the chance of receiving some amount
> of money greater than that deposited.

Furthermore, we add the qualification that the machine records the credits won on each play, and the credits are exchangeable for something of value. *See State v. Mendel*, 871 S.W.2d 906 (Tex. App.-Houston [14th Dist.] 1994, n.w.h.).

In order to answer Senator Montford's question, we must determine whether a slot machine is a "lottery" within the meaning of article III, section 47 of the Texas Constitution, which requires the legislature to "pass laws prohibiting lotteries and gift

enterprises." If slot machines fall into the category of "lotteries," the legislature may not authorize their operation without a constitutional amendment.

When the present Texas Constitution was adopted in 1876, it contained the following provision regarding "lotteries":

> The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States.[1]

Some of the briefs submitted to this office suggest that this provision, because it distinguished between "lotteries," "gift enterprises," and "other evasions involving the lottery principle," means that the term "lottery" should be construed, for constitutional purposes, very narrowly, and that in 1876, "lottery" could not have been intended to proscribe slot machines since that device was not invented until 1895. At most, these briefs argue, operation of a slot machine is an "evasion based on the lottery principle." When, in 1980, the "other evasions" language was deleted from article III, section 47, these briefs contend that the *constitutional* proscription against slot machines was lifted.[2]

As early as 1899, however, the Court of Criminal Appeals held that operation of a "slot machine," as described therein,[3] constituted a "lottery." *Prendergast v. State*, 57 S.W. 850, 851 (Tex. Crim. App. 1899). Then, in 1936, the Texas Supreme Court considered whether a "bank night" held weekly at a local theater[4] was a "lottery" under

---

[1]This general prohibition now appears as subsection (a) of article III, section 47. It reads:

> (a) The Legislature shall pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), and (e) of this section.

[2]The briefers acknowledge, of course, that operation of slot machines is still prohibited by *statute, viz.,* as a "gambling device" under chapter 47 of the Penal Code, but contend that the legislature may simply amend that statute to exclude slot machines from its ambit.

[3]The *Prendergast* court considered a very early version of the slot machine. It consisted of five colored slots-red, black, green, white, and yellow-into which the player could insert a nickel. If the player "won," the red and black slots paid out a dime; the green slot a quarter; the white slot fifty cents; and the yellow slot a dollar. Of course, in the usual circumstance, the player did not "win" anything. The court declared that, even though the machine itself "would be indictable as a gaming device," there is "no reason why the keeper [of the machine, *i.e.*, the owner of the premises in which the machine was displayed] was not also indictable for establishing a lottery." *Pendergast v. State*, 57 S.W. at 851.

[4]Griffith operated a motion picture theater in the city of Wink. On one night per week, denominated "bank night," a drawing was held in the theater for which the prize was $35. A patron became "eligible" for the drawing by signing a register left open at the ticket window of the theater. Griffith contended that any person was permitted to sign the register simply by asking to do so, and thus,

the constitution. *City of Wink v. Griffith Amusement Co.*, 100 S.W.2d 695 (Tex. 1936). In the course of its opinion, the court declared that article III, section 47, proscribed three activities: 1) lotteries, 2) gift enterprises, and 3) other evasions involving the lottery principle.[5] Furthermore, the court clearly articulated the three elements necessary to constitute a lottery: 1) the offering of a prize, 2) by chance, and 3) the giving of consideration for an opportunity to win the prize. Of the three, the court declared that "'chance' is the one which constitutes the very basis of a lottery, and without which it would not be a lottery." *City of Wink* 100 S.W.2d at 701. Although the court in *City of Wink* did not rule that "bank night" was a lottery, it did hold that "the Court of Civil Appeals had substantial grounds for the conclusion to the effect that the 'Bank Night' plan of defendant in error was a lottery." *Id.*, at 699-700. Furthermore, even if "not a lottery within the meaning of the Penal Code," it was nevertheless "at the very least a gift enterprise involving the lottery principle," and, as such, was proscribed by the Constitution. *Id.* at 700.

For our purposes, however, it is sufficient to note that the Supreme Court had by 1936 laid out the definitive elements which constitute a "lottery" in the state of Texas. Texas courts have consistently found that the term "lottery" includes a wide range of activities involving the distribution of something of value by chance in exchange for valuable consideration. This construction of the term "lottery" predates our current constitution. The constitution of 1845 and every subsequent constitution have included a prohibition against lotteries. The constitutions of 1845, 1861, 1866, and 1869 stated that "No lottery shall be authorized by this State; and the buying and selling of lottery tickets within this State is prohibited." TEX. CONST. art. XII, § 36 (1869); TEX CONST. art VII, § 17 (1866); TEX CONST. art. VII, § 17 (1861); TEX. CONST. art. VII, § 17 (1845). The constitutional convention of 1875 expanded this language in response to activities authorized by the Legislature of 1873 to state that "The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises, or other evasions involving the lottery principle,

---

no consideration was *required* for the privilege of participating in the drawing. The court was not persuaded by this argument: "[The] admission charge is inseparable from the privileges enumerated [seeing the movie and participating in the drawing], which were materially different from the privileges of those who remained outside of the theater holding the so-called 'free' registration numbers." *City of Wink*, 100 S.W.2d, at 699. Furthermore, it made no difference "that a claimant's right to the prize was evidenced by a registration book instead of a ticket, as is usual in lotteries. . . . The registration numbers represented 'chances' at the prize just as effectively as would tickets to the drawing." *Id.* (Original emphasis).

[5]At least one of the briefs construes the constitutional language to prohibit 1) lotteries, 2) gift enterprises, and 3) *"the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle."* Under this reading, the "other evasions" language is applicable only when *tickets* are sold. As syntactically attractive as this construction might be, it is barred by the Supreme Court's unequivocal language in *City of Wink*.

established or existing in other States." But even prior to the 1876 constitution, the Texas Supreme Court had found that

> it makes not the slightest difference whether it be styled a 'Gift Enterprise,' 'Book Sale,' 'Land Distribution,' or 'Art Association,' each and all are lotteries when the element of chance is connected with, or enters into the distribution of its prizes. . . . Courts will inquire *not* into the name, but the game, to 'determine whether it is a prohibited game.'

*Randle v. State*, 42 Tex. 580 (Tex. 1875) (Original emphasis). Later cases interpreted the prohibition to include bingo, raffles, sales schemes, and other giveaways, whether or not they had the three elements of "prize, chance and consideration," used by the court later to characterize a lottery. *See, e.g., City of Wink*, 100 S.W.2d 695.

In 1971, the legislature amended article 654 of the Penal Code, the criminal statute then implementing article III, section 47, to permit certain "charitable organizations to conduct lotteries for their benefit on property owned by the conducting agency" and allowing the "sale or drawing of a prize at a fair held in this State for the benefit of a church, religious society, veteran's organization," or similar entity. Acts 1971, 62d Leg., ch. 922, § 1, at 2823. As enacted, the amendment was intended to permit activities held under the aegis of a particular class of charitable or quasi-charitable institution, such as churches and veterans' organizations, that were otherwise proscribed by the Penal Code. In *Tussey v. State*, 494 S.W.2d 866, 869 (Tex. Crim. App. 1973), the court held that the language of article III, section 47, prohibited the legislature from granting this exemption. The court found that "any effort by the Legislature to authorize, license or legalize lotteries is unconstitutional in light of the constitutional provision in question. . . . Further, the Legislature is likewise prohibited from indirectly doing so by way of exemption from criminal prosecution." *Tussey v. State* 494 S.W.2d at 869; see also *City of Wink*, 100 S.W.2d 695. It is clear that the term "lottery" will be broadly construed by the courts, and that any game newly sanctioned by the legislature must be carefully scrutinized to determine whether it is a "lottery." If it is, it cannot be lawfully operated without a constitutional amendment.

Subsequent to the court's decision in *Tussey*, the legislature proposed, and the electorate approved, a series of amendments to article III, section 47. A 1980 amendment—the present subsections (b) and (c) of article III, section 47-excepted "bingo games conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs." S.J.R. 18, Acts 1979, 66th Leg., at 3221. Subsection (d) was added in 1989 to permit "charitable raffles" held by those entities which were already authorized to conduct bingo games. H.J.R. 32, § 1, Acts 1989, 71st Leg., at 6427. The most recent amendment, subsection (e), permits the

legislature to "authorize the State to operate lotteries and [to] authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State." H.J.R. 8, Acts 1991, 72d Leg., 1st C.S., at A-2.

"Lottery" is defined in section 47.01(6) of the Penal Code as

> any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value, whether such scheme or procedure is called a pool, lottery, raffle, gift, gift enterprise, sale, policy game, or some other name.

Attorney General Opinion JM-1267 (1990) considered whether a variety of "casino games," including "slot machines," could be validated by the legislature without the necessity of amending article III, section 47. The opinion "assume[d] that two of the necessary three elements of a lottery would be present during the holding of the gaming activities" described in the opinion—"i.e., the payment of consideration and the awarding of a prize"—and that the constitutionality of a particular game would be determined according to whether, and to what extent, it contained the element of *chance*.

Opinion JM-1267, relying on judicial decisions and Attorney General Opinion C-619 (1966), declared that the characterization of a particular game as a "lottery" is dependent upon "whether the *dominating element* of the entire scheme was that of chance, or that of skill, judgment, or ingenuity." Quoting from *Sherwood & Roberts-Yakima, Inc. v. Clyde G. Leach*, 409 P.2d 160 (Wash. 1965), Opinion C-619 stated that "[i]f chance predominates over skill or judgment and permeates the whole plan, a lottery is established." *See Adams v. Antonio*, 88 S.W.2d 503 (Tex. Civ. App.—Waco 1935, writ ref'd).

As this office stated in JM-1267, section 47 of article III does not "proscribe *all* forms of gambling." Pari-mutuel betting on horse or dog races, for example, although it may contain some element of chance, also depends, at least in part, on the bettor's skill. *See Panas v. Texas Breeders & Racing Ass'n*, 80 S.W.2d 1020 (Tex. Civ. App.—Galveston 1935, writ dism'd); *see also, Ginsberg v. Centennial Turf Club, Inc.*, 251 P.2d 926 (Colo. 1952); *People ex rel. Lawrence v. Fallon*, 46 N.E. 296 (N.Y. 1897). Opinion JM-1267 did not resolve whether any of the games at issue there "involve[d] the dominating element of skill, as opposed to chance," since resolution of that question was deemed to require findings of fact not appropriate to the opinion process. If, however, it can be determined that the slot machine pay out is based entirely on chance rather than skill, we can say that the operation of that device constitutes a "lottery" *as a matter of law*. *See State v. Fry*, 867 S.W.2d 398 (Tex. App.—Houston [14th Dist.] 1993, writ. ref.); *State v. Mendel*, 871 S.W.2d 906 (Tex. App.-Houston [14th Dist.] 1994, n.w.h.)..

Your request letter expresses your "understanding" that

> [w]hether the player wins or not depends entirely on chance and is
> not affected by any skill, judgment, or knowledge of the player.

In our opinion, this is a fair characterization of the device commonly referred to as a "slot machine." In a very recent opinion, the Attorney General of Kentucky held it to be "immediately apparent" that slot machines, as well as such games as roulette and craps, are purely games of chance:

> No one can know what the next pull on the handle, spin of the wheel,
> or throw of the dice will produce. It is impossible under these games
> as we know them for any player, no matter how skillful, to destroy
> the element of chance. They are lotteries, and in the case of slot
> machines, have routinely been held so.

Attorney General of Kentucky, Opinion No. 93-58 (1993).

Furthermore, the odds of "winning" are the same for every play. No matter how many games a player has played and lost, his odds of winning on the *next* pull of the handle remain unchanged. It is clear that operation of a "slot machine" which functions in the manner described herein, is, as a matter of law, a "lottery" for purposes of section 47 of article III of the Texas Constitution, and accordingly, may not be authorized by the legislature in the absence of a constitutional amendment.[6]

Representative Thompson asks whether, if the legislature is prohibited from directly authorizing private individuals and companies to operate slot machines within the state, it may authorize the state itself to do so and to contract with one or more entities that will operate the machines on behalf of the state. Representative Thompson's inquiry is prompted by the 1991 amendment to article III, section 47-the present subsection (e)-which authorized the state lottery:

> (e) The Legislature by general law may authorize the State to
> operate lotteries and may authorize the State to enter into a contract
> with one or more legal entities that will operate lotteries on behalf of
> the State.

---

[6]Some of the briefs also contend that the legislature may simply re-define "lottery" to exempt from its purview the operation of slot machines. The briefers rely on *Panas v. Texas Breeders & Racing Ass'n*, 80 S.W.2d 1020 (Tex. Civ. App.-Galveston 1935, writ dism'd) to support their position. In that case, the court determined that the legislature was constitutionally authorized to permit betting on horse races. As we have indicated, however, *supra*, pari-mutuel betting on horse or dog races is not entirely a game of chance. The legislature is not empowered to statutorily remove from the definition of "lottery" a game which inarguably conforms to the constitutional meaning of "lottery."

Some have argued that the State Lottery Commission may authorize its lottery operator to append "slot machines" to its repertoire of games, even in the absence of further statutory intervention. Indeed, it has even been suggested that some of the games currently being conducted are in fact "slot machines" in all but name.[7]  As we will demonstrate, such hypertechnical arguments cannot survive serious scrutiny.

In our view, the circumstances surrounding the adoption of subsection (e) make it abundantly clear that the voters who approved proposition 11 on the general election ballot of November 5, 1991, did not intend to legalize the operation of slot machines, whether by a private individual or company, by the state, or by a private individual or company on behalf of the state.

The joint resolution which placed the lottery amendment on the ballot, H.J.R. 8, Acts 1991, 72 Leg., 1st C.S., at A-2. used the language which now appears as subsection (e) of article III, section 47, i.e., "[t]he legislature by general law may authorize the State to operate *lotteries* . . . ."  (Emphasis added).[8]  However, the joint resolution read as follows:

> SECTION 2.  This proposed constitutional amendment shall be submitted to the voters at an election to be held on November 5, 1991.  The ballot shall be printed to provide for voting for or against the proposition:  'The constitutional amendment authorizing *a state lottery.*'

*Id.* (emphasis added).  We believe it is self-evident that voters presumed from the ballot language that they were voting for or against the common *perception* of a "state lottery," as denoted by the clear language of the ballot proposition, rather than a broad spectrum of games which embody the "lottery principle," as articulated by *City of Wink, Tussey,* and numerous other judicial decisions.  This view is amply supported by extrinsic evidence from contemporary newspaper accounts.

First, every newspaper article and editorial to which we have been directed refers to "a state lottery," "a lottery," or "a state-run lottery."  *See, e.g., Austin American-Statesman,* November 1, 1991, November 3, 1991, November 6, 1991.  In addition, the articles make frequent reference to other governmental bodies which have previously

---

[7]The State Lottery Act defines "lottery" as "the procedures operated by the state under this chapter through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize."  Gov't Code § 466.002(3).

[8]Tapes of the House debate on the second and third readings of H.J.R. 8 contain no reference whatever to slot machines.

adopted "lotteries," *e.g.*, Washington D.C., and New York State, neither of which permit government-operated slot machines. *Dallas Morning News*, November 1, 1991. Revenue estimates mentioned in newspaper accounts are based on the experience of other states which have conventional lotteries involving the purchase of lottery tickets and drawings for winning numbers. *Id.*

Some accounts also refer to the proposed state lottery as a "numbers game." *Houston Chronicle*, November 4, 1991; *Dallas Morning News*, November 3, 1991. The term "numbers game" has been authoritatively described as United States slang for "an illegal form of gambling in which bets are taken on the occurrence of numbers in a lottery or in the financial columns of a newspaper." Oxford English Dictionary, 2d ed., 1989, v. 10, at 590. The *OED* reference notes the use of the term as early as 1897 and as recently as 1975. We have found no evidence that the term "numbers game" has ever been used to refer to a "slot machine." Furthermore, some contemporary newspaper accounts make the point that the adoption of the lottery amendment will permit more than one form of "game," beginning with "scratch-off" lottery tickets," and progressing to "the big-money, computer-driven lotto games . . . ." *Dallas Morning News*, November 5, 1991; *see also*, *Austin American-Statesman*, November 6, 1991. We believe it is significant that *none* of the articles cited make any reference to "slot machines."

There are well-established principles of constitutional construction that apply in answering Representative Thompson's question. It must be determined whether the constitutional language is "plain and definite" and thus not subject to further interpretation. It is clear, as stated above, that the language voted upon by the electorate, that is, "The constitutional amendment authorizing *a state lottery*," is plain and definite. The constitutional amendment as passed by the voters does not include slot machines. Some have suggested, however, that the term "lotteries" as contained in subsection (e) should be interpreted as broadly as the courts have interpreted the same term in subsection (a). Assuming for the sake of argument that further interpretation is necessary, then we may apply principles of constitutional construction established by our courts in our consideration of the term, the first and most important of which is to give intent to the voters who adopted it. Based on the extrinsic evidence cited above, we do not believe the intent of the voters in approving the proposition, "The constitutional amendment authorizing *a state lottery*," (H.J.R. 8, *supra*, emphasis added) was to authorize slot machines.

> The fundamental rule for the government of courts in the interpretation or construction of a Constitution is to give effect to the intent of the people who adopted it. The meaning of a Constitution is fixed when it is adopted; and it is not different at any subsequent time when a court has occasion to pass upon it. Where its terms are plain and definite, that which the words declare is the meaning of the instrument. In such cases there is no room for construction; the

> words of the instrument lie before the court already molded to their use, and its province extends no further than the enforcement of the language as written.

*Cox v. Robinson*, 150 S.W. 1149, 1151 (Tex. 1912) (citations omitted).

In *San Antonio Independent School Dist. v. State*, 173 S.W. 525 (Tex. Civ. App.—San Antonio 1915), the court declared:

> [A] state Constitution should not receive a technical construction like a statute, but that rule of interpretation should be followed which carries out the apparent intention of the people who enacted it.

To construe the term "lotteries" in subsection (e) to include slot machines, would require applying a technical construction to the word "lotteries" derived from the case law which was not before the voters in 1991. Nor does the language placed before the voters suggest, on its face, such a construction. "[T]hose who are called upon to construe the [c]onstitution are not authorized to thwart the will of the people by reading into the [c]onstitution language not contained therein." *Cramer v. Shappard*, 167 S.W.2d 147, 154 (Tex. 1945). "It does not follow, either logically or grammatically, that, because a word is found in one sense in one connection in a [c]onstitution, therefore, the same sense is to be adapted in every other connection in which it occurs. Story on Constitution, § 454. *Koy v. Schneider*, 221 S.W. 880. 914 (Tex. 1950). Far less should the construction of a word approved by voters separated in time by more than a century be construed without reference to the context in which it was used and the intention it expressed.

Rather, we should construe the language of the exception in light of our contempory situation, by limiting the meaning of the term "lottery" as approved by the voters in 1991 to its plain meaning. To do otherwise, is to allow the exception to swallow the rule. We decline to give the language of subsection (e) so unreasonable a construction when a more sensible one suggests itself, especially when the more sensible interpretation gives effect to the proposition actually presented to the voters. If the proposition passed by the legislature and presented to the voters had been intended and understood to authorize state-operated casinos, it would have been a simple matter for the language to reflect that intention.[9]

---

[9]There were two proposals to amend the constitution to allow casino gaming before the legislature in 1993. Both House Joint Resolution 4 and House Bill 105 clearly articulate constitutional proposals to allow charity casino gaming. Neither bill uses the term "lottery" in its generic sense applied by the case law to express the purpose of allowing gaming activities not currently included in the exceptions to article III, section 47. House Bill 105, in fact, includes the term lottery in a list of activities consisting of pari-mutuel wagering, bingo, charitable raffles, and a sports pool, all of which are *specifically excluded* from the definition of casino gaming. The language proposed to be put before the

Honorable John T. Montford - Page 10 (DM-302)
Honorable Senfronia Thompson

However, again for the purpose of argument, another principle of constitutional construction that may be applied to the construction of the word "lotteries" in subsection (e) is the rule of *ejusdem generis*, which result in the same above mentioned conclusion.

> [W]here general words follow an enumeration of persons or things by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same kind or class as those specifically mentioned.

*San Antonio I.S.D. v. State*, 173 S.W. at 527. Simply put, the term "lotteries" is the third of three specific exceptions to the general prohibition against "lotteries and gift enterprises." Therefore, the term "lotteries" in subsection (e) may not be given its widest meaning but must be construed as belonging to the same "class" or category as charitable bingo and charitable raffles. Considered as the third in a series of narrowly circumscribed activities, the term "state-operated lotteries" would have to be understood to be a specific activity, and not to mean the entire class of activities to which bingo and raffles also belong. To read the amendment otherwise would lead to an absurd result. "[C]onstitutional and statutory provisions will not be so construed or interpreted as to lead to absurd conclusions . . . if any other conclusion or interpretation can reasonably be indulged in." *Cramer v. Sheppard*, 167 S.W.2d 147, 155 (Tex. 1943).

The term "slot machine," with its associated images of Las Vegas-style casinos, evokes intense emotion in many individuals who look upon a "state lottery" as a harmless, even benign, method of raising state revenue, one which is qualitatively different from the concept of "slot machine." No evidence has been presented that any portion of the electorate believed that, in approving the amendment for a "state lottery," it was thereby sanctioning slot machines. And as indicated, *supra*, a great deal of evidence suggests that the voters who adopted the lottery amendment intended thereby to authorize only the traditional form of "state lottery." We conclude, therefore, that subsection (e) of article III, section 47, does not empower the legislature to permit the state itself to operate slot machines, nor does it authorize the legislature to permit the state to contract with one or more entities that will operate the machines on the state's behalf.

Representative Thompson also asks whether the legislature may permit private individuals or entities to operate slot machines "on a riverboat or dockside casino" merely

---

voters was "The constitutional amendment authorizing casino gaming by charitable organizations." Tex. H.J.R. 4, 73d Leg. (1993). Clearly it would be absurd to impute to either the legislature or the voters the intention to include casino gaming in the phrase "a state lottery" as used in the constitutional amendment proposition that passed in 1991 when, with so little confusion and difficulty, it could have been put before the voters in plain and direct language, as House Joint Resolution 4 would have, had it passed the legislature.

by amending the definition of "bet" in section 47.01(1) of the Penal Code. As we have noted, the legislature may not, in light of the constitutional prohibition against "lotteries," validate slot machines simply by re-defining the term "lottery" to exclude slot machines from its purview. In our opinion, this principle applies equally to the definition of "bet." Article III, section 47, directs the legislature to "pass laws prohibiting the establishment of lotteries." Clearly, this constitutional provision is not self-enacting, and, had the legislature never enacted any implementing legislation, suit would not lie to compel enactment. However, where there is a history of penal statutes implementing the constitutional prohibition , repeal of one of those prohibitions is not a neutral act, and, in our opinion, such repeal would contravene the constitutional proscription of subsection (a) of section 47 of article III. We conclude, therefore, that the legislature may not legalize the operation of slot machines by private entities merely by amending the definition of "bet" in section 47.01(1) of the Penal Code.

## S U M M A R Y

A "slot machine," as that term is commonly understood, is a device which awards cash or other prizes solely on the basis of chance, and is not affected by any skill, judgment, or knowledge of a particular player. As such, it constitutes an unlawful lottery in contravention of article III, section 47 of the Texas Constitution. Operation of "slot machines" may not be authorized by the legislature in the absence of a constitutional amendment. Furthermore, subsection (e) of article III, section 47, does not authorize the legislature either to permit operation of slot machines *by the state*, or to permit the state to contract with one or more entities to operate slot machines *on behalf of the state*. The legislature may not legalize the operation of slot machines by private entities merely by amending the definition of "bet" in section 47.01(1) of the Penal Code.

Very truly yours,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

DREW T. DURHAM
Deputy Attorney General for Criminal Justice

RENEA HICKS
State Solicitor

JAVIER AGUILAR
Special Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Rick Gilpin
Assistant Attorney General