## STATE v. ROBB & ROWLEY UNITED,
### Inc., et al.

### No. 10698.

Court of Civil Appeals of Texas. Galveston.

Jan. 27, 1938.

On Appellant's Rehearing May 19, 1938.

Appellees' Rehearing Denied July 7, 1938.

918

Charles Procter, Co. Atty., of Palestine, for the State.

J. D. Pickett, of Palestine, for appellees.

CODY, Justice.

This is an appeal from the action of the trial court refusing, after hearing on notice, appellant's petition for temporary injunction which was filed on its behalf and in its name by the Hon. Charles Procter, County Attorney of Anderson County, and the action was brought expressly under Articles 4666 and 4667, R.S.1925, Vernon's Ann.Civ.St. arts. 4666, 4667. The petition charges that appellee Robb & Rowley United, Inc., which maintains in the City of Palestine a picture show business in three theaters (The Texas, the Ritz, and the Pal), and its manager, appellee J. F. Jones, are operating, and unless restrained will continue to operate, in connection with its picture show business, a gambling scheme or lottery on one night in each week, designated "Buck Night".

The evidence at the hearing shows that appellees in connection with the operation of their picture show conducted a "Bank Night", until the Supreme Court decided the case of City of Wink v. Griffin Amusement Company, 100 S.W.2d 695. Following that decision, appellees did not cease the practice of making cash awards which they had theretofore made to their patrons under the old "Bank Night" plan. But the plan on which the cash award was made was changed to some extent, and, as changed, was called "Buck Night" instead of "Bank Night". The old "Bank Night" plan is sufficiently described in the opinion in the City of Wink Case, supra, and will not be repeated here. While operating "Bank Night", appellees had accumulated for their register of names, whose corresponding numbers were placed in the container for mixing and drawing, about 13,-000 names. They retained their register of names, but, under the new plan, not only might a patron who had purchased a ticket to a performance in one of its show houses register, but the register was opened so that anyone who wished to have his name entered on it might do so. Appellees, however, did not rest there. They went out into the highways and byways, and solicited names to be added to their register. So that at the time of the hearing they had accumulated, in addition to the 13,000 names they had accumulated while operating the old "Bank Night", about 3000 more names on their register. The "Buck Night" plan provided, however, that the judges that superintended the drawing of numbers from the container should require three numbers to be drawn therefrom. And these three numbers, when drawn, were required to be placed on the backs respectively of the three contestants that were to engage in the contest provided for that particular "Buck Night". For on each "Buck Night" some sort of contest was put on, selected by the manager, such, for instance, as a pie eating contest. The number that had been pinned to the back of the

winner of the contest became the number that won the cash award for that particular "Buck Night". The winner's name was then called, not only inside the theatre but also on the outside at the entrance, and if he appeared and claimed the award within three minutes from the time that his name was called, he was given the cash award. If the winner did not appear and claim the award within three minutes from the time his name was called, the award was carried over added to the award to be made the following week. The amount of the award started off at $100 and continued to increase $100.00 per week, if not awarded, until it became $700. But if the amount of an award reached $700 without being claimed, it continued to be carried at that amount, while a new award of $100 was begun. In other words, appellees did not themselves claim any interest in the money (or bank if you prefer to call it so) that was to be awarded, other than that of a stakeholder. It was the purpose of the suit to have this scheme declared a nuisance, and have it abated, and its further operation enjoined.

Appellant has furnished us with an able and exhaustive brief, discussing numerous authorities. Its principal contention is that the scheme of "Buck Night" turns the show house into a gigantic gaming table; that its entire purpose is to obtain bettors, though disguised as theatre patrons, and that appellees kept, exhibited and played such gaming table, or bank, on the principle of the one against the many. Reliance for support of this position is chiefly on Stearnes v. State, 21 Tex. 692. Before discussing this contention we will apply the ruling of the City of Wink Case to the facts of this. In that case, our Supreme Court, speaking through Chief Justice Cureton, said (page 700):

"Section 47 of article 3 of the Constitution of this state [Vernon's Ann.St. art. 3, § 47] reads: 'The legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this state, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other states.'

"An analysis of this provision shows that the framers of the Constitution condemned in emphatic terms the establishment and operation in this state of (a) *'lotteries,'* (b) *'gift enterprises,'* and (c) *'other evasions involving the lottery principle.'* Lotteries *only* have been prohibited by the Penal Code in accordance with the constitutional mandate. 'Gift enterprises' and 'other evasions involving the lottery principle' nevertheless remain and stand condemned by the Constitution of the state as being against public policy. It is hardly necessary to argue that the 'Bank Night' plan of the defendant in error, if not a lottery, is at the very least a 'gift enterprise involving the lottery principle,' and obviously an evasion of the lottery laws of the state. That 'gift enterprises' are a form of lottery evasion is so well known that courts take judicial knowledge of the plan."

The opinion further states: "In fact, this court prior to the adoption of the [present] Constitution had judicially determined that enterprises such as that before us ['Bank Night' plan] were devices and subterfuges for evading the lottery laws."

And again:

"If it be granted that the plan of defendant in error's 'Bank Night' was not a lottery because a charge was not made for the registration entitling one to participate in the drawing (and this is the only distinction which is here or could be made), then it clearly comes within the condemnatory terms of the Constitution, because it is a 'gift enterprise' involving the lottery principle, which the authorities hold is that principle by which something is to be given by chance. 38 C.J. pp. 286 and 287, § 1, and authorities in note 8, and p. 289, § 3.

"In general, it may be said that chance is the basic element of a lottery. Unless a scheme for the awarding of a prize requires that it be awarded by a chance, it is not a lottery. As said in the case of State v. Lipkin, 169 N.C. 265, 84 S.E. 340, 344, L.R.A.1915F, 1018, Ann.Cas. 1917D, 137: 'The ingredient of chance is, obviously, the evil principle which the law denounces and will eradicate, however it may be clothed, or however it may conceal itself in a fair exterior.'

"There are, however, in a lottery, according to the authorities, three necessary elements, namely, the offering of a prize, the award of the prize by chance, and the giving of a consideration for an opportunity to win the prize. 38 C.J. p. 289, § 2. But the Constitution condemns those things which fall short of containing all the essential elements of a lottery, namely, those things which involve the lottery

**920**

principle, of which 'chance' is the one which constitutes the very basis of a lottery, and without which it would not be a lottery..

"An 'evasion' is defined by Webster's International Dictionary as 'act of eluding or avoiding,' or 'avoidance by artifice.'

"Defendant in error's 'Bank Night' plan was obviously an evasion of the lottery laws by the avoidance of a direct charge for prize chances (all other elements of a lottery being present), but, nevertheless, having the object of enriching the defendant in error by the 'chance' of gain just as much as though a direct charge had been made therefor, manifestly an attempted 'avoidance' of the lottery statute 'by artifice' in accordance with the generally accepted definition of 'evasion.' Therefore, defendant in error's 'Bank Night' plan stands condemned by the Constitution of Texas. Being condemned by the Constitution, it is against the 'public policy of the State'."

Applying the ruling made in the City of Wink Case to the facts of the present case, we hold that the "Buck Night" plan operated by appellees was not such a lottery as is denounced by the articles in the Penal Code thereagainst, but is an obvious evasion of the lottery laws by avoidance of a direct charge for prize chances. It is idle to contend that by superadding the contest feature to the drawing of the numbers from the container that the transaction is purged of its chance elements. That it in fact multiplies chance is too clear to require discussion. However, it is also clear that no direct charge is made to the participants. The requirement that the winner appear and claim the prize within three minutes from the time his name is announced at the entrance to the theatre undoubtedly operates as a tremendous pressure on anyone desiring to participate to pay the price of admission. That is undoubtedly its purpose. And it is equally obvious that the award is made out of funds accumulated from paid admissions. In short, the plan is a transparent evasion. And as such comes under the condemnatory terms of the Constitution. The "Buck Night" plan offends against the public policy of the State, and the Constitution contemplates that the legislature shall enact laws thereagainst. But, as pointed out in the City of Wink Case, the legislature has not as yet done so.

Furthermore, while the question is not before us, we have no doubt that the operation of the plan does constitute a public nuisance which is subject to be enjoined or ordered abated at the suit of the State. But not under the authority of Articles 4664–4667. For, as held by our Supreme Court, through the Commission of Appeals, "But Article 4667 clearly contemplates that injunction is not contemplated except in aid of criminal statutes clearly defining and prohibiting gaming and designated games." State ex rel. Shook v. All Texas Racing Association [128 Tex. 384], 97 S.W.2d 669, 671, 100 S.W.2d 348.

As already pointed out, it was stated in the City of Wink Case that an evasion of the lottery law, accomplished through means of a gift enterprise, is not denounced by any law in the Penal Code. It is certain that the framers of the present Constitution were of the opinion that statutes then in force did not prohibit such enterprises. The statute against keeping a gaming table or a bank, which appellant claims is being violated by operation of the "Buck Night" plan, was then in force. We will not further extend this opinion to show that the County Attorney did not have authority under Article 4667 to institute this action. The judgment of the trial court will be affirmed.

Affirmed.

PLEASANTS, C. J., absent.

On Appellant's Motion for Rehearing.

CODY, Justice.

After we handed down our former opinion and before the hearing on this motion for rehearing, the Court of Criminal Appeals, on February 2, 1938, overruled the motion for rehearing in the case of Cole v. State, 112 S.W.2d 725, and its opinion became available to us on this motion for rehearing. We do not doubt that the facts in this case make of it the legal equivalent of the Cole Case. We found in our original opinion that no direct charge was made for the right to participate in the gift enterprise that appellee conducted in connection with its theatre business. This right to participate, we in effect held, was not based on a consideration—giving to the word consideration the legal value ordinarily given to it as the

sine qua non of a valid, enforceable contract. All that was required of one desiring to participate in a drawing, was to have his name entered on the register. But if his name was drawn, he had to present himself within 3 minutes in the showhouse. This was a strong *motive*, and was intended as such, to make one who desired to participate, pay for an admission and be present on the night of a drawing. If the one whose name was drawn was not required to present himself in the showhouse until the night succeeding the drawing in order to become available to receive the award, the *motive* to purchase a ticket of admission would be greatly weakened. We construe the opinion in the Cole Case to hold, what we conceived to be a *motive*, to be *indirect consideration,* and further to hold that *indirect consideration* is consideration, and that there was therefore present in the transaction the essential element of consideration to make of it a lottery. Whether we have correctly understood the basis of the ruling made in the Cole Case or not, it is' clear that the effect of the ruling there made is to hold that appellee in the instant case was violating the criminal statutes of the State against lotteries in conducting Buck nights. Therefore, in as much as the Supreme Court—in dismissing an attempted certification of that question to it by this court —has made clear that it did not decide that question in the `Wink Case (cited in our original opinion), we have concluded that we are bound to follow the ruling in the Cole Case, construing the criminal statutes. The motion is therefore granted, our former judgment set aside, the judgment of the trial court reversed, and the prayer for temporary injunction granted.

Motion for rehearing granted, former judgment of affirmance set aside, judgment of the trial court reversed, and temporary injunction as prayed for granted.

PLEASANTS, C. J., absent.

On Appellees' Motion for Rehearing.

CODY, Justice.

On motion for rehearing, appellees, conceding perforce of the Cole Case the correctness of the holding that "Buck Night" is a lottery, strongly re-urge their position that, if it is a lottery, then for that reason, its operation is not subject to being enjoined under Articles 4664–4667, R.S. 1925, Vernon's Ann.Civ.St. arts. 4664–4667.

Art. 4667 provides:

"The habitual use, actual, threatened or contemplated, of any premises, place or building or part thereof, for any of the following uses shall be enjoined at the suit of either the State or any citizen thereof:

"1. For gaming or keeping or exhibiting games prohibited by law."

Appellees do not contend, of course, that lotteries are not prohibited by law. Nor do we understand appellees to contend that the operation of a lottery is not, in common parlance, gambling. But what we understand appellees to contend is that when the history and circumstances of this legislation are considered, and the history and circumstances of legislation against gambling generally, and against lotteries in particular, are considered, it will be seen that Art. 4667 was not intended to apply to lotteries.

It is doubtless true that lotteries occupy a unique place in the history of legislation against gambling in Texas. Every constitution of our State from 1845 down, has contained provisions against lotteries similar to those in our present constitution. And it is true that no other form of gambling has been thus singled out, and expressly denounced. Various reasons may be assigned for this. Other governments at various times have resorted to lotteries as a means of raising money. And in Lee v. City of Miami, 121 Fla. 93, 163 So. 486, 101 A.L.R. 1115, it was said that one of the chief characteristics of lotteries is that they infest the whole community, reach every class, prey upon the hard-earned savings of the poor, and plunder the ignorant and simple, whereas, in comparison, other forms of gambling affect only a few individuals. But for whatever reason the prohibition against lotteries was placed in the constitution, the result is that the legislature could not, if it wished, legalize any gambling device that would in effect amount to a lottery, while it has inherent power either to prohibit or regulate any other form of gambling.

We are not disposed to contest the proposition that "Lotteries are generally classified as a species of gambling, though the statutes dealing with them and other forms of gambling have recognized a clear line of distinction between them. This distinction has been recognized by different degrees of punishment and by the ascription of different attributes to each". Lee v. City of Miami, 121 Fla. 93, 163 So. 486, 489, 101 A.L.R. 1115 (cited by appellees). But the question we

have before us is: Did the legislature mean to include lotteries along with other forms of gambling in Art. 4667? The primary rule governing construction of statutes is to ascertain the Legislature's intention from the statutes' language. Wintermann v. McDonald, Tex.Sup., 102 S.W.2d 167. Article 10, and Sections 1, 6, and 8 thereof (R.S.1925) reads:

"Art. 10. [5502] [3268] General rules

"The following rules shall govern in the construction of all civil statutory enactments:

"1. The ordinary signification shall be applied to words, except words of art or words connected with a particular trade or subject matter, when they shall have the signification attached to them by experts in such art or trade, with reference to such subject matter. * * *

"6. In all interpretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy. * * *

"8. The rule of the common law that statutes in derogation thereof shall be strictly construed shall have no application to the Revised Statutes; but the said statutes shall constitute the law of this State respecting the subjects to which they relate; and the provisions thereof shall be liberally construed with a view to effect their objects and to promote justice."

Applying these statutory rules of construction to Section 1 of Article 4667, reading: "1. For gaming or keeping or exhibiting games prohibited by law"; how is it possible to say that lotteries are not included? The word gaming includes lotteries. State v. Randle, 41 Tex. 292; Boatwright v. State, 118 Tex.Cr.R. 381, 38 S.W.2d 87; McRae v. State, 46 Tex.Cr.R. 489, 81 S.W. 741; Berry v. State, 106 Tex. Cr.R. 657, 294 S.W. 216. Gaming is not a word of art, or a word connected with a particular trade or subject matter, having a technically fixed meaning. And the Legislature, having used a word which is comprehensive enough to include, in its ordinary signification, lotteries, on what principle are we authorized to look to the history of legislation relating to gaming, in order to engraft on the word gaming some limitation in meaning that will exclude lotteries? On what principle can we suppose that the Legislature meant to exempt lotteries from the provisions in question? Surely not because of the fact that lotteries occupy an invidious prominence among the various forms of gambling. If lotteries are so much worse than other forms of gambling that their greater evil makes them different, and puts them in a class to themselves, this seems to us a reason for believing the Legislature meant to include them, rather than to exclude them, from the operation of the article in question. To construe gaming, as used in the enactment, as excluding from its meaning lotteries, is to place, by judicial construction, a limitation thereon, which would not tend to promote either the object of the enactment, or justice. To prevent, by injunction, the operation of an unlawful lottery is certainly no injustice. And why a lottery should be immune from the salutary restraint contemplated by the enactment, more than less objectionable forms of gambling, it is hard to see. Certainly there is nothing in the enactment itself to suggest any such immunity was intended. The only immunity prescribed by the enactment, is with respect to gaming that is not prohibited by law. Since a lottery is gambling, and is prohibited by law, it comes within the terms of the enactment. Under the view which we have expressed it becomes unnecessary to pass on whether the appellant was authorized to proceed under Articles 4664–4666.

Appellees' motion for rehearing is refused.

Motion refused,

PLEASANTS, C. J., absent.