

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00185-CV

———————————————

THE CITY OF FORT WORTH AND DAVID COOKE, IN HIS OFFICIAL CAPACITY AS FORT WORTH CITY MANAGER, Appellants/Cross-Appellees

V.

STEPHANNIE LYNN RYLIE, TEXAS C&D AMUSEMENTS, INC., AND BRIAN AND LISA SCOTT D/B/A TSCA AND D/B/A RIVER BOTTOM PUB, Appellees/Cross-Appellants

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-276483-15

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Opinion by Justice Kerr

# OPINION ON REMAND

The Texas Constitution commands that the legislature pass laws prohibiting lotteries, *see* Tex. Const. art. III, § 47(a), and the legislature has largely done so, *see, e.g.*, Tex. Penal Code Ann. §§ 47.01–.11. That command is at the heart of an issue the Texas Supreme Court has asked us to decide and that we sidestepped in this appeal's first go-round: whether the eight-liner gambling machines at issue here, which are owned and operated by the appellees (the Operators), are unconstitutional or illegal. *City of Fort Worth v. Rylie (Rylie II)*, 602 S.W.3d 459, 460, 469 (Tex. 2020), *rev'g (Rylie I)*, 563 S.W.3d 346 (Tex. App.—Fort Worth 2018). The eight-liners are unconstitutional if they are lotteries; they are illegal either if not within the Penal Code's so-called "fuzzy animal" exclusion from the definition of outlawed gambling devices—an exclusion on which the Operators rely—or if the exclusion is itself unconstitutional, as the appellant City of Fort Worth contends. *See* Tex. Penal Code Ann. § 47.01(4)(B).

A categorization as either unconstitutional or illegal will resolve the underlying preemption issue pitting Texas Occupations Code Chapter 2153, which regulates "skill or pleasure coin-operated machines," *see* Tex. Occ. Code Ann. § 2153.001, against City licensing and zoning ordinances regulating game rooms that contain "amusement redemption machines," a term that includes eight-liners. That is because the Occupations Code "does not authorize or permit" the keeping or operating of a machine or device that is "prohibited by the constitution of this state *or* the Penal Code." *Id.* § 2153.003 (emphasis added). If either scenario exists, Chapter 2153 of the

Occupations Code has no preemptive effect because it does not apply to the Operators' machines. *Rylie II*, 602 S.W.3d at 468 (observing that "chapter 2153 does not apply to unconstitutional or illegal machines").

Because we conclude that these eight-liner video slot machines are lotteries—a term more expansive than most would assume—they are unconstitutional. As a result, the trial court erred in holding that the Occupations Code preempts certain parts of the ordinances, and we will reverse and render judgment in the City's favor on that part of the Operators' claims. We will affirm the trial court's judgment denying the rest of the Operators' Occupations Code preemption claims. Finally, Section 2153.003's disjunctive nature means that we need not reach the fuzzy-animal exclusion's applicability or constitutionality. *See* Tex. R. App. P. 47.1.

## I. BACKGROUND[1]

The Operators run game rooms containing eight-liner machines. Responding to what it perceived as such establishments' deleterious effects on the community, in 2014 the Fort Worth City Council passed two ordinances designed to rein in the proliferation of game rooms. The Operators challenged the ordinances, seeking a declaration that the Alcoholic Beverage Code and the Occupations Code preempt the ordinances in certain ways. *See* Tex. Alco. Bev. Code Ann. § 1.06 ("Code Exclusively

---

[1]Both the supreme court's opinion, *Rylie II*, 602 S.W.3d at 464–66, and our earlier opinion, *Rylie I*, 563 S.W.3d at 351–55, contain more detailed factual and procedural backgrounds, which we do not repeat here.

3

Governs"); Tex. Occ. Code Ann. §§ 2153.001–.453 ("Coin-Operated Machines"). The City counterclaimed for a declaration that the Penal Code's fuzzy-animal exclusion—under which the Operators claim they can legally possess and operate the machines—is an unconstitutional end-run around the Texas Constitution by attempting to authorize otherwise-forbidden lotteries by statute rather than by constitutional amendment. *See* Tex. Const. art. III, § 47; Tex. Penal Code Ann. § 47.01(4)(B).

The trial court partially agreed with the Operators, holding that certain of the City's ordinances were preempted, and denied relief on the City's counterclaim, concluding as a matter of law that the fuzzy-animal exclusion is constitutional. We affirmed in part and reversed in part, in the process concluding that whether the Operators' machines are constitutional or legal was irrelevant to the preemption issue. The supreme court disagreed. *Rylie II*, 602 S.W.3d at 469 ("We hold the court of appeals erred by concluding that the issue whether the Operators' machines are constitutional and legal is irrelevant to the question whether [Occupations Code] chapter 2153 preempts the City's ordinances and is therefore non-justiciable" and "remand the case to that court so that it can address and resolve that issue in the first instance."). We now do so, using the de novo standard of review that applies to both constitutional and statutory interpretation. *E.g.*, *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015); *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 585 (Tex. 2013).

4

## II. APPLICABLE LAW

### A.      The Texas Constitution and lotteries

Since 1845, the Texas Constitution has continuously prohibited lotteries.[2] As ratified in 1876 and to the present, our constitution affirmatively requires the legislature to "pass laws prohibiting" them. Tex. Const. art. III, § 47. As the supreme court noted in its opinion remanding this case to us, "[c]ontrary to the term's popular understanding," the word lottery includes a "wide array of activities that involve, at a minimum, (1) the payment of 'consideration' (2) for a 'chance' (3) to win a 'prize.'" *Rylie II*, 602 S.W.3d at 460–61 (citing *City of Wink v. Griffith Amusement Co.*, 100 S.W.2d 695, 698 (Tex. 1936)). Texas caselaw has reflected this broad understanding as far back as 1874, shortly before Texas citizens approved the 1876 constitution. *See Randle v. State*, 42 Tex. 580, 589 (1874) (observing that the activity's name "makes not the

---

[2]*See* Tex. Const. art. III, § 47 (amended 2021) ("The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States."); Tex. Const. of 1869, art. III, § XXVII ("The Legislature shall not authorize any lottery, and shall prohibit the sale of lottery tickets."), art. XII, § XXXVI ("No lottery shall be authorized by this State; and the buying and selling of lottery tickets within this State is prohibited."); Tex. Const. of 1866, art. VII, § 17 ("No lottery shall be authorized by this State; and the buying or selling of lottery tickets within this State is prohibited."); Tex. Const. of 1861, art. VII, § 17 ("No lottery shall be authorized by this State; and the buying or selling of lottery tickets within this State is prohibited."); Tex. Const. of 1845, art. VII, § 17 ("No lottery shall be authorized by this State; and the buying or selling of lottery tickets within this State, is prohibited."). We address 20th-century amendments authorizing charitable bingo, charitable raffles, and the state lottery later in this opinion.

slightest difference"; it is a lottery "when the element of chance is connected with, or enters into the distribution of its prizes"). And as made clear in *City of Wink* some 85 years ago, "[I]t may be said that chance is the basic element of a lottery. Unless a scheme for the awarding of a prize requires that it be awarded by a chance, it is not a lottery." 100 S.W.2d at 701 (referring to the "ingredient of chance" as the "evil principle which the law denounces and will eradicate, however it may be clothed, or however it may conceal itself in a fair exterior").[3]

The tripartite view of what constitutes a lottery—chance, prize, and consideration—is ubiquitous. *See, e.g., Fed. Commc'ns Comm'n v. Am. Broad. Co.*, 347 U.S. 284, 290, 74 S. Ct. 593, 598 (1954) (laying out the "three essential elements"); *U.S. Postal Serv. v. Amada*, 200 F.3d 647, 651 (9th Cir. 2000) (noting that absent a statutory definition, "the appropriate definition to apply is the common law lottery definition consistently used by the courts and described by the Supreme Court as the 'traditional tests of chance, prize and consideration'"); *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993) (same); *Roberts v. Commc'ns Inv. Club of Woonsocket*, 431 A.2d 1206, 1211 (R.I. 1981) ("It is well settled that a 'lottery' proscribed in either a state

---

[3]The 1800s had witnessed a sea-change in public attitudes toward lotteries. Though widely used in America's early days as revenue-raising devices to compensate for the lack of a strong central government and a weak tax base, as more mature forms of taxation increased—alongside lottery fraud and the social miseries accompanying gambling addictions—lotteries became almost universally prohibited in state constitutions by the end of the 19th century. Ronald J. Rychlack, *Lotteries, Revenue and Social Costs: A Historical Examination of State-Sponsored Gambling*, 34 B.C. L. Rev. 11, 12, 37–38 (1992).

constitution or statute is defined as a scheme or plan having three essential elements: consideration, chance, and prize. . . . If all of the elements are present, the scheme is a lottery, regardless of the purpose of its sponsor.").

Even with the best of intentions, the legislature cannot sanction a lottery of any type; a constitutional amendment is necessary. *See Tussey v. State*, 494 S.W.2d 866, 869 (Tex. Crim. App. 1973). In *Tussey*, the court of criminal appeals analyzed a 1971 amendment to the Penal Code that excepted from prosecution churches, religious societies, veterans organizations, and other nonprofit charitable organizations that conducted lotteries for their own benefit. Holding that the legislature had exceeded its authority, the court of criminal appeals gave the backdrop of both the 1869 and 1876 constitutions and concluded that "any effort by the Legislature to authorize, license[,] or legalize lotteries is unconstitutional in light of the constitutional provision" requiring the "passage of laws against the establishment of lotteries in various forms." *Id.* at 869. "Further, the Legislature is likewise prohibited from indirectly doing so by way of exemption from criminal prosecution." *Id.* (citing *City of Wink*, 100 S.W.2d at 700–02). The *Tussey* court drove the point home: "It is clear that the Legislature was not authorized to exempt from the laws relating to lotteries the sale or drawing of a prize at a fair for the benefit of a church, religious society, veteran's organization, etc." *Id.*; *see also State v. Amvets Post No. 80*, 541 S.W.2d 481, 482–83 (Tex. App.—Dallas 1976, no writ) (entering temporary injunction against

7

veterans-club bingo game and stating that "a lottery is no less a lottery if the proceeds are used for charitable purposes" (citing *Tussey*)).

Several years after *Tussey* and *Amvets*, the legislature proposed and voters approved a 1980 constitutional amendment to allow charitable bingo. Tex. Const. art. III, § 47(b)–(c) (added by Tex. S.J. Res. 18, 66th Leg., R.S., 1979 Tex. Gen. Laws 3221) (authorizing legislature to allow and regulate "bingo games conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs"). A later amendment permitted "charitable raffles" to be held by the same types of organizations. Tex. Const. art. III, § 47(d) (added by Tex. H.J. Res. 32, 71st Leg., R.S., 1989 Tex. Gen. Laws 6427). Most recently, in 1991, Texans authorized a state lottery. Tex. Const. art. III, § 47(e) (added by Tex. H.J. Res. 8, 72d Leg., 1st C.S., 1991 Tex. Gen. Laws 1113). As it stands, these are the only types of lotteries that the Texas Constitution allows.

### B. Lotteries and slot machines (video or otherwise)

Given the expansive common-law definition—chance, prize, and consideration—it's hard to imagine any circumstance under which a slot machine is not a lottery. And indeed, Texas authorities have unanimously so concluded: "A slot machine is a lottery."[4] *Queen v. State*, 246 S.W. 384, 386 (Tex. Crim. App. 1922) (citing

---

[4]The supreme court here seems almost to have buried the lede by (approvingly) quoting that sentence in a footnote. *Rylie II*, 602 S.W.3d at 461 n.2.

*Prendergast v. State*, 57 S.W. 850, 851 (Tex. Crim. App. 1899)); *see also* Tex. Att'y Gen. Op. No. DM-302, at \*4 (1994) ("If . . . the slot machine pay out is based entirely on chance rather than skill, we can say that the operation of that device constitutes a 'lottery' as a matter of law.") (citing *State v. Fry*, 867 S.W.2d 398 (Tex. App.—Houston [14th Dist.] 1993, no writ); *State v. Mendel*, 871 S.W.2d 906 (Tex. App.—Houston [14th Dist.] 1994, no writ)).[5]

"Eight-liners generally operate like a video slot machine," with "nine electronic symbols arranged in three columns and three rows." *Rylie II*, 602 S.W.3d at 462; *see also In re Gambling Devices & Proceeds*, 496 S.W.3d 159, 161 (Tex. App.—San Antonio 2016, pet. denied) (involving "electronic slot machines commonly known as 'eight liners'"); *Mendel*, 871 S.W.2d at 907 (describing devices as "Lucky 8 Liner video slot machines"); Jason Johns, Comment, *Win, Lose, or Draw: The Rise of Eight-Liner Video Devices in Texas*, 34 Tex. Tech. L. Rev. 263, 290 (2003) ("Even if some electronic gambling machines [such as draw poker and pinball] present elements of skill, eight-liners do not appear to fall within this category. Their operation is very similar to a

---

[5]The Operators stipulated that their eight-liners are all "played solely or predominantly by chance, involving little or no skill on the part of the player" and that "[t]he player has no control over the odds of winning." This stipulation means that we need not ponder such metaphysical questions as whether a device that a player has a mere 1% chance of losing to would be a prohibited lottery. We do note that a sister court has considered (and rejected) a sliding-scale-type argument advanced in connection with a void-for-vagueness challenge, holding that something is indeed a "gambling device" if it incorporates "*any* element of chance, even if the exercise of skill also influences the outcome." *State v. Gambling Device*, 859 S.W.2d 519, 523 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (emphasis added).

slot machine['s] with the only difference being the game is played on a video screen rather than mechanical columns and reels.").[6]

## C. The Penal Code and the fuzzy-animal exclusion

In obeying the constitution's lottery-denouncing mandate, the legislature enacted what became Penal Code Chapter 47, titled "Gambling."[7] Tex. Penal Code Ann. § 47.01–.11. Among other things, this chapter makes it a criminal offense to "own, manufacture, transfer, or possess a 'gambling device.'" *Rylie II*, 602 S.W.3d at 461.

> The term "gambling device" includes "any electronic, electromechanical, or mechanical contrivance . . . that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance." [Tex. Penal Code Ann.] § 47.01(4). This includes, as

---

[6]The Comment author also opines that "eight-liner machines, even if used within the bounds of the [fuzzy-animal] exception, have all the elements of a lottery, and are thus only allowable if the Texas Legislature amends the constitution to provide for their use." Johns, *supra*, at 209; *see also* Tex. Att'y Gen. Op. No. DM-302, at *3 ("It is clear that the term 'lottery' will be broadly construed by the courts, and that any game newly sanctioned by the legislature must be carefully scrutinized to determine whether it is a 'lottery.' If it is, it cannot be lawfully operated without a constitutional amendment.").

[7]The Penal Code as enacted in its modern form in 1973 resulted from the "substantial revision process conducted by the Texas Penal Code Revision Project, a collaborative effort of the Texas Bar Association and the Texas Legislative Council, from 1965 to 1973. This was the first full recodification since the Code's previous enactment in 1856." *Texas Penal Code Revision Research Guide*, Legislative Reference Library of Texas, https://lrl.texas.gov/collections/PenalCodeIntro.cfm (last visited Mar. 14, 2022).

examples, electronic or mechanical versions of "bingo, keno, blackjack, lottery, roulette, [and] video poker." *Id.* § 47.01(4)(A).

*Id.* (second alteration in original).

By the early 1990s, the rise of amusement centers such as Chuck E. Cheese, Dave & Busters, and Main Event, with their "electronic and mechanical games that at least arguably constitute lotteries or gambling devices," *id.*, posed a potential problem. Were tiny birthday-party-goers complicit in lawbreaking? Was this merry mouse a mobster in the making?



Although the City notes that the games at "carnival-like operations (e.g., Chuck E. Cheese and Dave & Buster's)" require skill, not chance, to win—meaning that most family-fun-center games probably wouldn't be lotteries or gambling devices in the first place—the legislature approached the issue proactively and enacted the 1995[8]

---

[8]As the supreme court has explained,

Paragraph (B) was introduced in Senate Bill 522, which amended section 47.01(4) and became effective August 30, 1993. Act of May 31, 1993, 73rd Leg., R.S., ch. 774, § 1, 1993 Tex. Gen. Laws 3027, 3027–28. Yet when the new Penal Code became effective on September 1, 1994, it did not contain paragraph (B). Tex. Penal Code § 47.01(4) (1994).

fuzzy-animal exclusion by adding Section 47.01(4)(B) to the Penal Code. *See* Tex. Penal Code Ann. § 47.01(4)(B); H. Rsch. Org., Bill Analysis, Tex. S.B. 522, 73d Leg., R.S. (1993) ("SB 522 would clear up a gray area in the law by exempting bona fide amusement games such as the kind that allow persons to use skill to win fuzzy animals . . . ."). Under this definitional exclusion, the term "gambling device"

> does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.

Tex. Penal Code Ann. § 47.01(4)(B).

Eight-liner owners began to rely on the fuzzy-animal exclusion in arguing that their machines are not illegal gambling devices. *Rylie II*, 602 S.W.3d at 462. Depending on how eight-liners awarded prizes of particular types, that argument succeeded or failed in varying measures. *See State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 181 (Tex. 2013) (holding that eight-liners in question did "not fall within the exclusion in section 47.01(4)(B) because the distributed tickets were not redeemable *exclusively* for noncash merchandise prizes, toys, or novelties"); *Hardy*, 102 S.W.3d at

---

Consequently, the Legislature re-enacted the amendment in 1995. Act of May 27, 1995, 74th Leg., R.S., ch. 318, § 19, 1995 Tex. Gen. Laws 2734, 2742.

*Hardy v. State*, 102 S.W.3d 123, 131 n.5 (Tex. 2003).

132 (affirming forfeiture of eight-liners that, because they awarded gift certificates as prizes, "[did] not meet the section 47.01(4)(B) exclusion and were [thus] subject to forfeiture or destruction as gambling devices"); *see also State v. One Super Cherry Master Video 8-Liner Mach.*, 102 S.W.3d 132, 133 (Tex. 2003) (referring to *Hardy*'s same-day holding and reciting that person in possession of alleged gambling device has "the burden to prove, by a preponderance of the evidence, at a show cause hearing either that the machine is not a gambling device or that the exclusion in Penal Code section 47.01(4)(B) applies").[9]

## III. DISCUSSION

Precedent stretching back more than a century and roughly contemporaneous with the 1876 constitution's ratification—and, indeed, reinforced in the supreme court's opinion in the very case at hand—leaves us with no doubt that the Operators' eight-liners are lotteries and that without an amendment to the Texas Constitution, they are forbidden.[10] *See* Tex. Const. art. III, § 47; *Rylie II*, 602 S.W.3d at 460–61; *Hardy*, 102 S.W.3d at 130 ("Our current constitution requires that the Legislature

---

[9]None of these supreme-court cases involved an express challenge to the fuzzy-animal exclusion's constitutionality, and the court has "never addressed that issue." *Rylie II*, 602 S.W.3d at 462–63.

[10]The several amendments to Article III, Section 47 cannot be read as signaling voter approval of eight-liners, nor do the Operators argue that they do. *Cf.* Tex. Att'y Gen. Op. No. GA-0103, at *2–7 (2003) (explaining that in approving a state lottery as the ballot proposition phrased it, and given the popular definition of that term in 1991 when Article III, Section 47 was last amended, Texas voters did not also intend to approve state-run slot machines).

prohibit all lotteries or gift enterprises other than those the constitution expressly authorizes."); *City of Wink*, 100 S.W.2d at 698; *Randle*, 42 Tex. at 589; *cf. Tussey*, 494 S.W.2d at 869 (holding that legislature cannot indirectly authorize lotteries by way of exemption from criminal prosecution).

Although the Operators gamely put forth what the City has categorized as three arguments for their eight-liners' constitutionality, we are unpersuaded.[11]

## A. The legislature can't define around the constitution.

Citing *Willis v. State*, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990), the Operators assert that because the Texas Constitution does not define "lottery," the legislature is free to decide—within reason—what the word means, as it can also establish and define criminal offenses and applicable defenses. Thus, they say, the fuzzy-animal exclusion represents nothing more than a proper exercise of the legislature's power to establish the definitional contours of lotteries.[12] But that approach does not comport with how we are to construe the constitution.

---

[11]The bulk of the Operators' briefing on remand deals with the eight-liners' alleged legality under the fuzzy-animal exclusion rather than mounting a full-throated defense of the machines' constitutionality—that is, as "not-lotteries." Particularly in light of the Operators' stipulations, their focus isn't surprising.

[12]As the Operators put it, "The Legislature gets to determine that [a] 'fuzzy animal' [game] is not a 'lottery' the Constitution meant to prohibit." If that were true, though, the legislature's earlier attempt to exclude lotteries with noble purposes—charitable bingo, for one—would surely not have been held unconstitutional. *See Tussey*, 494 S.W.2d at 869; *Amvets*, 541 S.W.2d at 482–83.

In undertaking such a task, we consider "the intent of the people who adopted it," looking to "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished." *Edgewood ISD v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989) (cleaned up). But because discerning long-ago intent is inherently difficult, we must principally give effect to the constitution's plain language, "rely[ing] heavily on its literal text." *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997). We "strive

---

The history of bingo in the United States, incidentally, refutes by analogy the Operators' additional argument that the 1845 constitution could not have considered slot machines to be lotteries because slot machines weren't invented until the mid-1890s. But the same could have been argued more forcefully of bingo as a "not-lottery": bingo wasn't played in America until even later, in the 1920s, although the exact year and place at which it emerged are murky. *See*, *e.g.*, Mary Bellis, *Bingo: History of the Game*, ThoughtCo., https://www.thoughtco.com/history-of-bingo-4077068 (June 24, 2019) ("When the game reached North America in 1929, it became known as 'beano.' It was first played at a carnival near Atlanta, Georgia."); *Bingo (American version)*, Wikipedia, https://en.wikipedia.org/wiki/Bingo_ (American_ version) (last visited Mar. 14, 2022) ("In the early 1920s, Hugh J. Ward created and standardized the game at carnivals in and around Pittsburgh and the Western Pennsylvania area."); *The Popularity of Bingo: UK vs. USA*, The Antelope Valley Times (Jan. 28, 2021), https://theavtimes.com/2021/01/28/the-popularity-of-bingo-uk-vs-usa/ ("Originally arriving on American shores in the 1920s, the game inspired by European lotto was first known as 'Beano.' This was down to the fact that players covered their cards of numbered squares with rows of beans."); *Where did Bingo begin? The history for one of the world's most popular pastimes*, Manchester Evening News, https://www.manchestereveningnews.co.uk/special-features/history-bingo-look-one-worlds-6618763 (Jan. 30, 2014, 12:46 PM) ("The game travelled to North America in the 1920s where its name evolved to 'Beano'—players used to shout this when they found all numbers in a row"; "by the 1940s people were playing bingo across the country"); *see also* Tex. Att'y Gen. Op. No. DM-302, at *1–4 (rejecting argument, like the Operators', that "in 1876, 'lottery' could not have been intended to proscribe slot machines since that device was not invented until 1895").

15

to give constitutional provisions the effect their makers and adopters intended," and in that process "[w]e presume the constitution's language was carefully selected, and we interpret words as they are generally understood." *Garofolo v. Ocwen Loan Servicing, L.L.C.*, 497 S.W.3d 474, 477 (Tex. 2016); *see also Armbrister v. Morales*, 943 S.W.2d 202, 205 (Tex. 1997) ("In interpreting the constitution, we give words their natural, obvious, and ordinary meanings as they are understood by the citizens who adopted them."); *Mumme v. Mars*, 40 S.W.2d 31, 35 (Tex. 1931) ("Constitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption . . . ."); *Mellinger v. City of Houston*, 3 S.W. 249, 252 (Tex. 1887) ("In the construction of a constitution, it is to be presumed that the language in which it is written was carefully selected, and made to express the will of the people, and that in adopting it they intended to give effect to every one of its provisions.").

Certainly by 1876, a lottery was understood to involve the elements of chance, consideration, and prize.[13] Indeed, the Texas Supreme Court's *Randle* decision of 1874, addressing as it did those commonly recognized elements, reinforces that courts and voters all knew what they had in mind when condemning lotteries in 1876. *Randle*, 42 Tex. at 589 (holding that scheme for distributing prizes by chance was a "lottery within the very letter and spirit of the law"); *see* Tex. Const. art. III, § 47.

---

[13]That understanding has not changed. *Cf. Rylie II*, 602 S.W.3d at 460–61, 461 n.2 (noting the three elements and that a "wide array of activities" involve them).

Because the Operators stipulated that their eight-liners award prizes by chance and for consideration, the machines are lotteries, and the legislature cannot define around that fact. *See Rylie II*, 602 S.W.3d at 468 (observing that the legislature "cannot change or ignore the meaning of the constitution's text"); *cf. Panas v. Tex. Breeders & Racing Ass'n*, 80 S.W.2d 1020, 1023–24 (Tex. App.—Galveston 1935, writ dism'd) (determining that legislature could allow pari-mutuel betting on horse races because that system is not a lottery); Tex. Att'y Gen. Op. DM-302, at *4–5, *5 n.6 (discussing *Panas* and noting that "pari-mutuel betting on horse or dog races is not entirely a game of chance. The legislature is not empowered to remove from the definition of 'lottery' a game which inarguably conforms to the constitutional meaning of 'lottery'").[14] "Courts need not exert their ingenuity to find reasons to thwart the intention of the people clearly expressed in the Constitution, which is the supreme law of the land." *Carpenter v. Sheppard*, 145 S.W.2d 562, 567 (Tex. 1940).

---

[14]We are unpersuaded by the Operators' appeal to Mississippi authority. In the case they cite, the Mississippi Supreme Court held that bingo, which that state's legislature had exempted from statutes criminalizing lotteries and other types of gambling, was not a "lottery" under the popular understanding of the word and also because the Mississippi Constitution twice refers to lottery "tickets," something that "clearly connotes a particular kind of lottery: one with tickets." *Knight v. State ex rel. Moore*, 574 So. 2d 662, 669 (Miss. 1990) ("The provision strongly suggests a restrictive definition—that not all forms of lottery (assuming bingo is even a form) are banned (*i.e.*, only those with tickets). . . . Few commonly consider bingo as having tickets that are sold, and any attempt to equate a bingo card with a lottery ticket would be superficial at best and unpersuasive at worst."). The Texas Constitution is not comparable to Mississippi's in this regard.

17

Another case on which the Operators rely deferred to the legislature—wrongly, in our view—to define what "lottery" means. *Owens v. State*, 19 S.W.3d 480 (Tex. App.—Amarillo 2000, no pet.). Owens had an establishment in Lubbock with over sixty "video poker or video lottery machines, commonly known as eight-liners," and was charged with promoting gambling and with possessing gambling machines. *Id.* at 481; *see* Tex. Penal Code Ann. §§ 47.03, .06. When she tried to raise a Section 47.01(4)(B) defense, the State convinced the trial court that the fuzzy-animal exclusion was unconstitutional based on a then-recent AG opinion to that effect. *Owens*, 19 S.W.3d at 482 (discussing Tex. Att'y Gen. Op. No. DM-466 (1998)). After entering a plea deal, Owens argued on permissive appeal[15] that the trial court had erred in declaring the exclusion—her only defense—unconstitutional.

Agreeing with the defendant, our sister court included its view that the presumptive validity of the legislature's definition of "gambling device" in Section 47.01(4)(A) and (B) meant that the trial court had erred in holding the fuzzy-animal exclusion to be unconstitutional. *Id.* at 484. Among the court's reasons was that because Article III, Section 47 is not self-executing, the legislature is to "implement public policy," "may define terms [such as *lottery*] which are not defined in the Constitution itself," and "possesses the power to create and define offenses within its sound discretion." *Id.*

---

[15] *See* Tex. R. App. P. 25.2(a)(2).

We see this analysis as flawed, principally because by deferring to the legislature, the *Owens* court bypassed its threshold duty to construe the constitution's meaning with reference to 1876 common understanding. *See, e.g., Armbrister*, 943 S.W.2d at 205 ("In interpreting the constitution, we give words their natural, obvious, and ordinary meanings as they are understood by the citizens who adopted them."). As we have already discussed, by the late 19th century everyone understood that lotteries comprise chance, prize, and consideration. The legislature simply can't "change or ignore the meaning of the constitution's text." *Rylie II*, 602 S.W.3d at 468; *see also* Tex. Att'y Gen. Op. DM-302, at *5 n.6 ("The legislature is not empowered to statutorily remove from the definition of 'lottery' a game which inarguably conforms to the constitutional meaning of 'lottery.'"). Although the *Owens* court acknowledged that legislature-supplied definitions must "constitute reasonable interpretations of the constitutional language" and "not do violence to the plain meaning and intent of the constitutional framers," it did not engage in such interpretation and construction. *Owens*, 19 S.W.3d at 483–84. We thus find *Owens* unhelpful.

**B. That not all forms of gambling are lotteries is irrelevant.**

The Operators also contend, rightly, that "while all lotteries are a form of gambling, not all forms of gambling are lotteries." Indeed, they quote from a 1938 opinion that explains the distinction—and explains also why lotteries are the worst form:

It is doubtless true that lotteries occupy a unique place in the history of legislation against gambling in Texas. Every constitution of our State from 1845 down, has contained provisions against lotteries similar to those in our present constitution. And it is true that no other form of gambling has been thus singled out, and expressly denounced. . . . [O]ne of the chief characteristics of lotteries is that they infest the whole community, reach every class, prey upon the hard-earned savings of the poor, and plunder the ignorant and simple, whereas, in comparison, other forms of gambling affect only a few individuals.

*State v. Robb & Rowley United, Inc.*, 118 S.W.2d 917, 921 (Tex. App.—Galveston 1938, no writ) (op. on reh'g). And because the "prohibition against lotteries was placed in the constitution," the legislature "could not, if it wished, legalize any gambling device that would in effect amount to a lottery, while it has inherent power either to prohibit or regulate any other form of gambling."[16] *Id.*

The Operators point to a case in which—"most significantly," in their view—a marble machine was not found to be a lottery. *Stanley v. State*, 154 S.W.2d 856 (Tex. Crim. App. 1941). From that case, the Operators deduce that "the question of what is, and what is not, a lottery does not distil to a handy three-part test."[17] Yet *Stanley* was so light on facts as to be useless in drawing any conclusions about the machine at

---

[16]Pari-mutuel betting, for example.

[17]The Operators also claim that *Stanley* is "important" here because a marble machine was a device that the legislature had recently begun taxing as a "'skill or pleasure coin-operated machine' under the predecessor to current Chapter 2153" of the Occupations Code. They have not cited us any authority for that statement. But more importantly, the supreme court has already told us that Chapter 2153 "does not give legal authority to unconstitutional or illegal machines." *Rylie II*, 602 S.W.3d at 467.

issue there and how the three-part test did or didn't fit. Stanley was convicted of keeping a marble machine (a "gaming device") for the purpose of gambling. *Id.* at 857. For reasons not explained, on rehearing he urged that the court "erred in not holding that the marble machine . . . was a slot machine and came within the category of a lottery." *Id.* at 859 (op. on reh'g). The court's only response was, "We are not favorably impressed with the appellant's contention that the marble machine here involved fell within the category of a lottery. Hence we overrule that contention." *Id.* The machine was never described, the tripartite test never mentioned. *See id.*

In any event, the Operators have not explained what elements beyond chance, consideration, and prize are arguably pertinent when it comes to whether their eight-liners are unconstitutional lotteries. We conclude that, in fact, "what is, and what is not, a lottery" *does* "distil to a handy three-part test." *See Rylie II*, 602 S.W.3d at 461 (describing a lottery as involving the three elements "at a minimum"); *City of Wink*, 100 S.W.2d at 698. That additional features might be present in a given lottery does not mean that a scheme or machine consisting merely of the three—as the Operators have stipulated to here—is somehow not a lottery.

### C. The 1980 constitutional amendment didn't change the fact that eight-liners are lotteries.

Before 1980, Article III, Section 47 read, "The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, *as well as* the sale of tickets in lotteries, gift enterprises or *other evasions involving the lottery principle*,

21

established or existing in other States." Tex. Const. art. III, § 47 (emphases added). After voters approved charitable bingo in 1980, and charitable raffles and the state lottery later, the section now reads, "The Legislature shall pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), (d-1), and (e) of this section." *Id.* § 47(a).

The Operators see legal significance in the 1980 deletion of language about lottery "evasions," and we suppose it might be significant to some hypothetical scheme in some hypothetical case. But eight-liners are not evasions involving the lottery principle; they *are* lotteries, plain and simple. Because the constitution has required the legislature to prohibit lotteries both before and after 1980, the "as well as . . . evasions" deletion is beside the point here.[18]

And despite the Operators' efforts to parse it favorably, in our view *City of Wink* does not support their idea that the supreme court "did not suggest" that the three elements "are sufficient alone." The only reason the court there discussed the theater's "bank night" drawing in terms of a lottery evasion, as opposed to holding that it was an outright lottery, was that to be entered into the weekly chance drawing at the theater for a cash prize, one did not have to buy a movie ticket—that is, pay

---

[18]The *Owens* court concluded that the amendments essentially relaxed the conception of lotteries, writing that before the "as well as" clause was deleted, "lotteries were denounced in any form." 19 S.W.3d at 483–84. We respectfully disagree that, post-1980, the legislature was thereby free to define (or redefine) the term.

consideration. *City of Wink*, 100 S.W.2d at 697. Anyone could register at the window for free, so the scheme lacked one of the three primal lottery elements.[19] The court denounced the scheme as "obviously an evasion of the lottery laws" because it "[avoided] a direct charge for prize chances (all other elements of a lottery being present), but, nevertheless, having the object of enriching [the theater operator] by the 'chance' of gain just as much as though a direct charge had been made therefor." *Id.* at 701. So although the Operators are technically correct that *City of Wink* "holds only for the proposition that an activity lacking in one of the three elements is not a lottery" (but could be a lottery evasion), in the case before us—because of the parties' stipulations—that holding is irrelevant. We thus see nothing about the 1980 constitution's dropping the "evasions" clause that is outcome-determinative or legally significant.

In sum, the Operators' eight-liners are lotteries, and they are unconstitutional. Accordingly, because Occupations Code Section 2153.003 provides that Chapter 2153 does not "authorize" or "permit" unconstitutional machines, the Code's

---

[19]"True, no doubt if any one had applied for a free registration to the drawing, it would have been given, but human nature is such that the average person would seldom, if at all, suffer the natural embarrassment of asking for a free registration. . . . In fact, the whole plan is built up and made profitable because no normal person likes to 'bum' his neighbor for something, and by an appeal to the psychology of cupidity which makes some take a chance of making large gains by a small outlay [that is, the price of a theater ticket]. Those who invented and formulated the plan may not have been 'learned in the law,' but their knowledge of mass-psychology was not wanting." *City of Wink*, 100 S.W.2d at 697–98.

preemptive effect—argued by the Operators as a way to avoid the City's ordinances—falls by the wayside. And the further disjunctive in Section 2153.003, referring to machines "prohibited by the constitution of this state or the Penal Code," underpins our assigned task to decide "whether the Operators' machines are unconstitutional *or* illegal." *Rylie II*, 602 S.W.3d at 466–67, 469 (emphasis added). On these facts and in this procedural posture, answering one of those questions is enough; any thoughts we might offer on the machines' possible illegality and the fuzzy-animal exclusion's constitutionality would be dicta.

## IV. CONCLUSION

Because the Operators' eight-liner machines are lotteries and thus are unconstitutional machines, Chapter 2153 of the Occupations Code does not preempt the City's ordinances regulating game rooms and eight-liners. We thus reverse the trial court's judgment holding that the Occupations Code preempts certain parts of the City's ordinances and render judgment for the City on that part of the Operators' claims.[20] We affirm the trial court's judgment denying the rest of the Operators'

---

[20]Left open is what happens now with those ordinances. As the supreme court noted, "Of course, a finding that the machines are unconstitutional or illegal would also lead to the question whether the City could license, regulate, and tax them through the City's ordinances. That question, however, has not been raised in this case." *Rylie II*, 602 S.W.3d at 469 n.20; *see also Rylie I*, 563 S.W.3d at 357 n.11 ("The City fails to explain how, if the State may not regulate an allegedly illegal machine, the City itself may nevertheless validly impose and enforce a comprehensive regulatory scheme on that same machine.").

24

Occupations Code preemption claims. In all other respects, our original disposition remains the same.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  March 17, 2022